IN THE

## SUPREME COURT OF JUDICATURE

OF THE

## STATE OF NEW-YORK,

IN JANUARY TERM, 1836—IN THE SIXTIETH YEAR OF THE INDEPENDENCE
OF THE UNITED STATES.

---

## THE PEOPLE *vs.* THE RENSSELAER AND SARATOGA RAIL ROAD COMPANY.

It is competent to a state government to authorize the erection of a bridge
across a navigable river, at a point below where the coasting trade is car-
ried on by licenced vessels, provided that the bridge be built with a draw
for the passing and repassing of vessels free of expense.

The Rensselaer and Saratoga Rail Road Company are authorized, by their
act of incorporation, to build a bridge across the Hudson river from the
city of Troy to Green Island, on the opposite side of the river.

In an information in the nature of a *quo warranto* against a corporation, call-
ing upon them to show by what *warrant* they use certain franchises alleg-
ed to have been usurped, it is a sufficient answer to say that such franchi-
ses were granted by an act of the legislature; it is not competent to the
attorney general in behalf of *the people* to allege that the act of the legisla-
ture is repugnant to the constitution of the United States and the laws of
congress, and therefore void.

An *information* in the nature of a *quo warranto*, filed under the revised stat-
utes against a *corporation* by its corporate name, admits the existence of
the corporation, or that it once had a legal existence.

*It seems*, that previous to those statutes, it would have been sufficient, in a
plea to an information against a corporation by its corporate name, to set
forth the charter and to allege acts of *user* under it, without showing a
compliance with the requirements of the charter authorizing corporate

acts; and if there had been a neglect to comply with any of the require-
ments, it must have been shown by replication.

The People
v.
Saratoga and
Rensselaer
R. R. Co.

QUO WARRANTO. The attorney general filed an informa-
tion, in the nature of a *quo warranto*, against The Rensselaer
and Saratoga Rail Road Company, charging the company
with claiming to be a body politic and corporate in law, fact
and name, by the name of The Rensselaer and Saratoga Rail
Road Company, and with claiming the liberty, privilege and
franchise of placing abutments, piers and other works, in the
bed, current and channel of the Hudson river at Troy, in the
county of Rensselaer, and of erecting and constructing a
bridge upon such abutments, &c. over and across the river
from the eastern to the western bank thereof: averring the
river, at the place where the abutments were claimed to be
placed and bridge to be built, to be an arm of the sea in which
the tide ebbs and flows, navigable for sloops, schooners, and
other vessels, and to have been used and to be still used, by
the citizens of this state and of the United States, in carrying
on trade, commerce and intercourse, by means of such sloops,
&c. under and in pursuance of the acts of the congress of the
United States, between ports and places on the Atlantic ocean,
and towns and places on the banks of the river situate *above*
Troy, to wit, the villages of Lansingburgh and Waterford;
concluding in the usual form, by praying process, &c.

The defendants pleaded, that by an act of the legislature of
this state, passed 14th April, 1832, they were created a body
corporate and politic, in fact and in name, by the name of
The Rensselaer and Saratoga Rail Road Company, for the
term of 50 years, for the purpose of constructing a single or
double rail road or way from some proper point in the city of
Troy, in the county of Rensselaer, passing through the vil-
lage of Waterford, in the county of Saratoga, to the village of
Ballston Spa, in the latter county; and that, by virtue of
such act of the legislature, they are a body politic and corpo-
rate, in fact and in name, entitled to use the liberties, privile-
ges and franchises granted to them, and for all the time men-
tioned in the information have used the same, and particular-
ly the liberty, privilege and franchise of constructing a single

or double rail road or way, from a proper point in the city of Troy, in the county of Rensselaer, passing through the village of Waterford, in the county of Saratoga, to the village of Ballston Spa, *and as a necessary part of such rail road or way, and not otherwise,*have used the liberty, privilege or franchise of *placing the abutments, &c.* and laying string pieces, beams and other timbers upon such abutments, &c. and of building and constructing a bridge over and across the river, from the eastern bank thereof in the city of Troy and on the direct route of such rail road to the western bank of the river on Green Island, in the county of Albany, *leaving over the main or principal part of the channel an opening for a convenient and suitable draw, to enable vessels navigating the river to pass and repass,* and so as to restore the river to its former state, or in a sufficient manner not to have impaired its usefulness as a public navigable river ; and of upholding and maintaining such bridge, &c. To which answer the attorney general put in a general demurrer, and the defendants joined.

*S. Stevens,* for the People. The plea does not show the defendants to be a corporation. The charter does not *ipso facto* create them a body corporate ; an acceptance or acts of user under it should have been shown. The charter requires that within one year, books shall be opened for subscription to the capital stock of the company, and that within a limited time trustees shall be chosen to manage its concerns. *Session Laws of* 1832, *p.* 199 ; and by the general act relative to corporations, it is declared that if a corporation, created by the legislature, does not organize and commence the transaction of its business within one year from the date of its incorporation, its corporate powers shall cease. 1 *R.S.* 600, §7. The defendants were bound to show a compliance with these requirements, as until then the exercise of any corporate powers was a usurpation. Charging the defendants by a corporate name did not admit them to be a corporation. *The King* v. *Amery,* 2 *T.R.* 515. *Bank of Auburn* v. *Aikin,* 18 *Johns. R.*137. *Wood* v.*Jefferson County Bank,*9 *Cowen,*194. *Walker* v. *Devereaux,* 4 *Paige,* 245. He also insisted that the legislature never intended to confer the power upon the compa-

ALBANY,
Jan. 1836.

The People
v
Saratoga and
Rensselaer
R. R. Co.

ALBANY,
Jan. 1836.

The People
v.
Saratoga and
Rensselaer
R. R Co.

ny to erect a bridge across the Hudson river, and particularly that the act of incorporation does not authorize the building of a bridge *at Troy,* or at any point below Union Bridge at Waterford. The 13th section forbids the erection of a bridge within two miles of the Union Bridge, and authorizes an agreement, by the Rensselaer and Saratoga Rail Road Company, with the owners of that bridge, for the use thereof; and it may well be imagined that the legislature contemplated that such an agreement would be effected. Conceding, however, that the defendants might, by *implication,* have the power to erect a bridge, such right could be exercised only in such way as not to *impair* the navigation. The act of incorporation declares, that whenever it shall be necessary for the construction of the rail road to intersect or cross any stream of water or water courses, or any road, street or highway, the company may construct their rail road across or upon the same ; but they shall restore the stream or water course, or road, street or highway thus intersected, to its *former state,* or in such manner as not to have *impaired its usefulness.* The defendants therefore should have averred that, after constructing their works, they restored the river to its former state, or that their works were so constructed that the usefulness of the river was not impaired ; and such averment should have been made in plain, distinct and direct terms, so that issue might have been taken upon it. This they had not done, and for that cause also the plea was bad. He also insisted that the act of incorporation, authorizing the construction of a bridge across a navigable river, was unconstitutional and void, as coming in collision with the power of the congress of the United States to regulate commerce and navigation, and the laws passed upon that subject. The Hudson river, at the place where the defendants are about to erect their bridge, is an arm of the sea, navigable for vessels sailing under coasting licences. The state legislatures may regulate fisheries, and exercise many acts of sovereignty over the waters within their several limits, but can legally do no act to interrupt the free use of navigable rivers for the purposes of navigation and commerce. 4 *Wash. C. C. R.* 379. A law of a state legislature, requiring the payment of the most trifling amount, or

imposing the slightest penalty in reference to the navigation of a river within its bounds, is unconstitutional and void, 12 *Wheaton,* 419 ; and within the same principle, a law authorizing the construction of a bridge across a navigable river should be held void, although built with a draw, for the passing and repassing of vessels.   Such a bridge cannot be otherwise than an obstruction to navigation, and an interruption to the free use of a navigable river.   The power to regulate commerce, and the intercourse of citizens by means of navigation, appertains to the general government, and of necessity must exclusively belong to that government ; and no act of a state legislature, obstructing, impairing or interrupting the free use of such waters for the purposes of navigation, can be legal.   9 *Wheaton,* 1.   3 *Cowen,* 739.   2 *Peters,* 245. 1 *Kent's Comm.* 437.

ALBANY,
Jan. 1836.

The People
v.
Saratoga and
Rensselaer
R. R. Co.

*D. Buel, jun.,* for the defendants, insisted that the plea sufficiently showed the defendants to be a body politic and corporate, and that the very filing of the information against them in their corporate name, admitted that they were a corporation.   So it was conceded by counsel *arguendo* in the case of *The People* v. *Bank of Niagara,* 6 *Cowen,* 196,205, 207.   The case of *The King* v. *Amery,* cited on the other side, was reversed in the house of lords, 4 *T. R.* 122.   The law upon this point, as conceded in *The People* v. *Bank of Niagara,* is now settled by the Revised Statutes, distinguishing between informations filed against *individuals* associated together and acting as a corporation without being legally incorporated, and informations filed against a *corporate body*— and authorizing an information against a corporation exercising a franchise or privilege not conferred upon it by law.   2 *R. S.* 581, § 28, and 583, § 39. The information in this case is of the latter kind, and the attorney general, by filing it, admitted the corporate character of the defendants.   It was enough that the plea was as general as the information.   The defendants were required to show by what warrant they did the acts charged ; they answered by virtue of their charter— and if the attorney general was not satisfied with such answer, he should have specially replied the facts of non-compliance

ALBANY,
Jan. 1836.

The People
v.
Saratoga and
Rensselaer
R. R. Co.

with the requirements of the charter if such facts existed. On the merits, the counsel insisted that the first section of the act expressly gives the right to build a bridge at Troy ; that when the *termini* of the road are considered, no other conclusion can be arrived at. The company are authorized to construct a rail road from some proper point in *the city of Troy*, through the village of Waterford to *Ballston Spa;* and, to accomplish such work, they must of necessity cross the river, and, according to a proper construction of the act, at a point in the route as direct, or as nearly direct, as the general course of the road was designated by the act of incorporation. If, however, there could be any doubt whether the right to erect the bridge was *expressly granted,* there could be no question as to the right by *implication,* arising from the prohibition to erect a bridge within two miles of the Union Bridge. In reference to the provision, that the *stream* crossed by the rail road shall be restored to its former state, or in such manner as not to have impaired its usefulness, he contended that it should receive such a construction as to carry into effect the intent of the legislature—which was that the stream should be left as useful to the public as was consistent with the erection and maintenance of the rail road across the same. This the defendants suppose they have accomplished, by leaving a suitable draw in the bridge for the passing and repassing of vessels. So they aver in their plea, and allege that they have so done, " so as to restore the river to its former state, or .in a sufficient manner not to have impaired its usefulness as a public navigable river." The counsel next inquired as to the effect of the grant upon the individual rights of citizens navigating the river, and being compelled to pass a draw in a bridge erected across a river before unobstructed. In reference to which, he said that the power of the legislature was as sovereign in respect to the waters as to the land within the territorial limits of the state ; that it was the province of the legislature to determine what would best promote the interest or the convenience of the public, and if they thought proper to authorize the erection of a bridge across a navigable river, the rights of individuals must yield to the public good: in support of which position, he cited 7 *Pickering*, 445, where

this question is fully discussed and considered; also 1 *Pickering,* 180, 4 *id.* 460, *Angell on TideWaters,* 48, 9 *Johns. R.* 507, 1 *Kent's Comm.* 411, 8 *Cowen,* 146, 4 *Wendell,* 9. The counsel also insisted that the act authorizing the erection of the bridge was not unconstitutional, or in conflict with the laws of congress in respect to commerce and navigation. In the cases arising in *Massachusetts,* above cited, the question here raised was not even adverted to; the acts there were complained of merely as the improvident exercise of legislative power in reference to individual rights. In *Gibbons* v. *Ogden,* 9 *Wheaton,* 203, Chief Justice Marshall classes laws relating to turnpike roads and ferries, among that mass of legislation which embraces every thing within the territory of a state not surrendered to the general government. If turnpike roads and ferries appertain of right to state legislation, of course rail roads are of the same character, and may well be considered as embraced in the *et cætera* added by the chief justice to his enumeration. In the case of *Willson and others* v. *The Black Bird Creek Marsh Company,* 2 *Peters' S. C. R.* 245, the principle involved in the question now under consideration arose, and was decided in favor of state legislation.

*B. F. Butler,* (attorney general of the U. S.) on the same side, after commenting upon the form of the pleadings and the powers conferred upon the defendants, proceeded to the consideration of the constitutional question raised by the counsel for the people. He observed that the whole argument of the counsel proceeded on the assumption that the placing of the abutments, &c. in the river necessarily would impede the navigation of vessels. The information alleges that the river is a navigable river, has been used as such, and is still so used. There is no allegation in the information, or admission in the plea, that the navigation has been impeded by the works of the defendants, and therefore the question sought to be raised is not properly before the court. Can this court say judicially that the navigation of the Hudson has been impeded by the acts charged? A bridge does not necessarily impede navigation, for even ships pass beyond bridges, at London, at Charlestown and many other places. The court cannot

ALBANY,
Jan. 1836.

The People
v.
Saratoga and
Rensselaer
R. R. Co.

ALBANY,
Jan. 1836.

The People
v.
Saratoga and
Rensselaer
R. R. Co.

know but that the *draw* will be so extensive and perfect as that there will be no reasonable pretext of complaint of interruption to the navigation. The counsel also submitted whether this question could arise between the parties to this suit. There is no complaint on the part of the general government, or of any person claiming under the laws of congress. If there be any one who alleges that he has sustained injury, let him bring his suit and he will be entitled to be heard. If judgment passes against him he can appeal to the proper tribunal for a review upon the constitutional question; but if judgment is rendered against these defendants, they cannot have such redress, because there is no claim set up under the constitution or laws of the United States. It was not necessary, he said, that the state should voluntarily repudiate her own act of sovereignty, when no complaint was made by the general government, or by any person claiming under that government. A *quo warranto* lies for the usurpation of a franchise; the defendants are charged with such an usurpation and are called on to show their warrant. It is a sufficient answer to the state to show her own charter granted by herself. It cannot be said that the charter is not the act of the sovereign authority, but merely the act of the legislature, the agents of the state. The legislature have all the power belonging to the state, and if the grant exceeds the power of the state, the state cannot complain—no one but an injured party can complain—and if there was a want of power, the plaintiffs are not entitled to judgment, for the complaint here is that the defendants have usurped what *belonged* to the people. The remedy, if any, was by *scire facias* to repeal the charter, and not by *quo warranto*. 2 *R. S.* 579, § 13, 14. But the legislature were authorized to grant the charter, and the state is estopped by the acts of its agents. *The People* v. *Manhattan Company*, 9 *Wendell*, 351.

But allowing that the constitutional question could properly be raised, the attorney general insisted that the inquiry was not whether the state government could pass a law authorizing the erection of a bridge across a navigable river so as totally to obstruct the navigation and prevent the passage of vessels; but whether they had the power to authorize a bridge

to be erected with a draw so that vessels might conveniently pass and repass at a place on a navigable river above ports of delivery. He conceded that a bridge *without* a draw, *above* ports of delivery, totally obstructing the navigation, and a bridge *with* a draw, built across a navigable river *below* ports of delivery, could not be maintained, but contended that a bridge like the one in question was not the subject of complaint. To test the validity of a state law in reference to the constitution of the United States or the laws of congress to carry into effect its provisions, he said, the source or head of power to which the law properly belongs must be looked into. If the state government has undertaken to do what it never had power to do, or is prohibited from doing, the law is void ; but if it merely exercises powers appertaining to a sovereign state, and which have not been delegated *exclusively* to the general government, a law enacted by it is valid, although passed on a subject in reference to which congress have a right to legislate. The power of congress to regulate commerce with foreign nations and among the several states, does not deprive the state governments of the right of regulating the internal commerce, or the intercourse between different parts of the state, provided the legislation of the state does not interfere with the legislation of the general government. When the laws of the state and general government come in collision, the latter must prevail. On this point the attorney general adverted to the opinion of *Thompson, J.,* in the case of *Livingston* v. *Van Ingen,* 9 *Johns. R.* 568, and to that of *Kent, C. J.,* in the same case, pages 576 to 581, in which the chief justice adverts to the construction of the powers of the federal compact as given by *Hamilton* in the 32d number of the *Federalist.* He also cited the opinion of Chief Justice *Marshall,* in 4 *Wheaton,* 196, and of Mr. Justice *Story* in 5 *Wheaton,* 49. In *Gibbons* v. *Ogden,* 9 *Wheaton,* 211, Chief Justice Marshall, after adverting to an argument urged in that case, that the words " to regulate " imply in their nature full power over the thing to be regulated, and exclude necessarily the action of all others that would perform the same operation on the same thing, observed that there was great force in the argument,

ALBANY,
Jan. 1836.

The People
v.
Saratoga and
Rensselaer
R. R. Co.

ALBANY,
Jan. 1836.

The People
v.
Saratoga and
Rensselaer
R. R. Co.

and that the court was not satisfied that it had been refuted, leaving the question however undecided ; and this court will not go in advance of the courts of the United States in disclaiming state jurisdiction. The question passed over in *Gibbons* v. *Ogden*, subsequently arose in *Willson and others* v. *The Black Bird Creek Marsh Company*, 2 *Peters' S. C. R.* 245, where a dam was erected under the authority of a law of the state of Delaware across a navigable creek through which the tide ebbed and flowed, and it was held by Chief Justice Marshall, that measures calculated to enhance the value of property by excluding water from marshes and designed to improve the health of the inhabitants, if they do not come into collision with the powers of the general government, are undoubtedly within those reserved to the states ; and that though the dam stopped a navigable creek, the law of Delaware did not come in conflict with the constitution of the United States or the laws of congress regulating commerce, as congress had passed no act to control state legislation over the small navigable creeks into which the tide flows, abounding throughout the lower country of the middle and southern states ; that the mere repugnancy of the law of Delaware to the *power of congress* to regulate commerce did not render the law void; inasmuch as such power had not been exercised so as to affect the question then before the court. Thus the state law in that case was held valid, although the Black Bird creek was a navigable creek, in which the tide ebbed and flowed, and as much within the operation of the general law of congress regulating commerce as the Hudson river above Troy. He insisted that the law by virtue of which the bridge in question was authorized to be built, belonged to that class of legislation in which the powers of the state and general governments might be concurrently exercised, and in which the state law must be held valid, until it comes in collision with a law of congress. He instanced the laws of this state regulating weights and measures, the management of steam boats, &c. &c. in reference to which the power of congress to legislate is unquestionable, and yet the validity of which had never been questioned.

The attorney general further argued, that the practical effect and operation of a state law was another test by which to determine its constitutionality; if found not to clash with any of the laws of congress passed under the provisions of the constitution, the law was valid. The object of the act in question was to facilitate intercommunication between the citizens of the state; its bearing upon the commerce of the states being very remote. It is an internal improvement for a local purpose to which the power of the general government does not extend, and which exclusively belongs to the state government. The general government cannot authorize the erection of such a bridge, nor can it prohibit its erection. The right of a state to establish *ferries* has never been questioned, and *bridges* are but substitutes for ferries. The law provides that the bridge in question shall not interfere with navigation, by requiring that the river shall be restored to its former usefulness, and the defendants have averred in their plea, that they have constructed their works so as to leave over the main or principal part of the channel an opening for a convenient and suitable draw to enable vessels navigating the river to pass and repass. To pass a draw-bridge must necessarily cause some delay, but it cannot with propriety be said to be an interruption of the right to navigate. As well might it be said that our quarantine laws come in collision with the law of congress in respect to navigation. Under those laws vessels are not only delayed for weeks and months, but sometimes wholly prevented from reaching their port of destination. The right of enforcing quarantine laws has never been disputed, and yet to open communications and facilitate the business transactions of its citizens is the duty of a state legislature, as well as to guard and protect the health of the inhabitants of the state. Laws for these purposes, passed in good faith, without intent of encroachment upon the powers of the general government, and only incidentally and not essentially coming in collision with those powers, ought to be held valid and carried into effect. The powers of each government must be reasonably exercised; the rights of either must not be unnecessarily infringed, and inconveniences arising from the exercise of common rights over

ALBANY,
Jan. 1836.

The People
v.
Saratoga and
Rensselaer
R. R. Co.

ALBANY,
Jan. 1836.

The People
v.
Saratoga and
Rensselaer
R. R. Co.

the same subject must be submitted to. In short, the principle *sic utere tuo, alienum non loedas,* applied to individuals in the enjoyment of a common right, should control this question between the general and state governments. In this way the essential rights of each will be secured.

*Stevens,* in reply. The proceeding by information in the nature of a *quo warranto* was proper in this case, and it was not necessary to proceed by *scire facias.* A *quo warranto* lies to revoke letters patent. *Palmer's R.* 1. *Kyd on Corporations,* 409. The people are not *estopped* by the act of the legislature, but may avail themselves of the protection of the constitution and laws of the United States against an unconstitutional act. As to the case of *Willson and others* v. *The Black Bird Creek Marsh Company,* cited on the other side, he understood the decision of the court to proceed upon the principle that congress had passed no act, in execution of the power to regulate commerce, the object of which was to control state legislation over creeks of the description of Black Bird creek, and that therefore the law of Delaware, under which the company had erected their dam, was valid; for Chief Justice Marshall said, if congress had passed any act which bore upon the case, the court would not have felt much difficulty in pronouncing that a state law coming in conflict with such act would be void. As the creek was a navigable creek, in which the tide ebbed and flowed, the counsel said he could not perceive why it came not under the operation of the general law of congress regulating commerce. Be that however as it might, the decision of that case was an authority in point to support the information here; for although the creeks in the marshes at the south might be considered as not of sufficient consequence to be embraced in the general navigation act, it could not be pretended that the *Hudson river* was not embraced in it; and if so, a coasting vessel sailing under a licence of the U. S. was entitled to proceed to any place on the river, where the river was navigable, free from all interruption; for congress had passed a law in execution of the power to regulate commerce, and the state law coming in conflict with it, the latter of course was void.

*By the Court,* SAVAGE, Ch. J.   In support of the first ob-
jection taken on behalf of the people, it is argued that it is not
enough for the defendants to aver in their plea that by virtue
of the act of .1832, they are created and constituted a body
corporate and politic in fact and in name ; but that they
should aver a compliance with the requirements of that act,
and also with the general act relating to corporations, and
shew a performance affirmatively of those acts which were ne-
cessary to authorize them to organize and act as a corporation.
The case of *The King* v. *Amery,* 2 *T. R.* 515, is cited as an
authority on this point, but I am not able to perceive that the
decision in that case turned upon that question.  The informa-
tion was filed against the defendant as an individual for exer-
cising the office of alderman of the city of Chester.  He plead-
ed a charter granted by Charles II, and that he was regularly
elected an alderman under that charter.  The prosecutor took
issue upon these facts ; and also put in two special replica-
tions ; 1. That the mayor, &c. were removed by the king by
virtue of a power for that purpose reserved in the charter ; and
2. That the attorney general filed an information against the
corporation charging them with usurpation, and that such
proceedings were had that judgment *quosque* was entered by
default ; and that a subsequent charter was granted by James
II, in October, 1688, restoring the city of Chester to its an-
cient privileges, which was accepted by the mayor and citi-
zens, whereby the charter of Charles 2d became void.   To
the 2d replication the defendant rejoined, that judgment of
seizure was rendered against the old corporation in the reign
of Charles 2d, whereby the corporation was dissolved long be-
fore the charter by James 2d.   Issue was joined, and on trial
the jury found, among other-things, the charter of Charles 2d
as in the defendant's plea, and that the defendant was duly
elected by that charter ; that the order of removal of James
2d was duly signified to the citizens and inhabitants, and that
there was no final judgment upon the *quo warranto.*   A mo-
tion was made to deliver the postea to the defendant, that he
might enter judgment thereon.   The argument in that case
contains much learning on the subject of proceedings against
corporations ; but it is not necessary to go at large into it.   It

ALBANY,
Jan. 1836.

The People
v
Saratoga and
Rensselaer
R. R. Co.

ALBANY,
Jan. 1836.

The People
v.
Saratoga and
Rensselaer
R. R. Co.

was urged on the part of the prosecution that there are but two sorts of proceedings against a corporation ; 1. When a corporation legally created abuse any of its franchises, or usurp others which do not belong to it, then the information should be against the corporation as such, and in such cases the judgment against it is a judgment of seizure ; but when a body of men assume to be a corporation, and the information is brought for usurpation, it cannot be brought against them by their corporate name, but as individuals ; and in such case there must be a judment of ouster.   On the other hand, the opposite doctrine was maintained, and Ashurst, justice, in giving the opinion of the court, says that the information called upon the mayor and citizens to show by what authority they claimed to be a corporation ; *non constat* by that information that there was any corporation in Chester.   The information imports the contrary, for it charges them with having usurped the name, privileges and authority of a corporation, without any legal right.   He says if any charter or prescription existed, it was incumbent on the defendants to have appeared and shewn it ; and by not doing so, they admitted that there was neither charter nor prescription to warrant such usurpation.   This is the whole point of the decision in so far as it is applicable here ; and all it proves is, that the information is regular in proceeding against the defendants by their corporate name ; but it does not prove that the defendants should do more in their plea than to claim title under their charter.   It is not adjudged that the defendants should aver any acts of theirs under the charter to effect their incorporation.

The question as to the form of the plea in a *quo warranto* does not appear to have been much discussed in the cases in this court. In *The People* v. *Niagara Bank*, 6 *Cowen*, 196, and the two following cases, informations were filed against corporations ; and the allegation was made, that without any warrant, grant or charter, they used certain privileges and franchises, to wit, that of being a body politic and corporate in law, fact and name, &c.   To this charge the defendants answer, that by a certain act of the legislature; (setting out the title of their act of incorporation,) they were ordained, constituted and declared to be a body corporate and politic, in fact

and in name ; but they do not state the acts which were ne-
cessary to be done ; such as the opening of books of subscrip-
tion by commissioners ; the subscription by the stockholders ;
the apportionment of the stock and the election of directors.
No exception was taken to the plea on this ground, and there-
fore the approbation by the court of this general mode of plead-
ing ought not, perhaps, to be considered a positive authority in
favor of it. Neither do the cases brought *by* corporations upon
contracts prove much on this point. In the case of the *Bank of
Auburn* v. *Aikin*, 18 *Johns.R.* 137, the defendants had plead-
ed *nul tiel corporation,* to which the plaintiffs replied that they
were a corporation. The court said the replication was bad ;
the plaintiffs should have shewn specially how they were a
corporation. Of this case it may be said, that the decision
founded on the authority of 1 *Kidd,* 284, does not give any
precise rule, farther than an intimation that there should have
been an averment of the performance of those acts which
were to be done before they could be a corporation. In *Wood*
v. *Jefferson Co. Bank,* 9 *Cowen,* 194, such a replication was
put in to a plea of no corporation, and more was averred than
was necessary. It was held that the corporation were not
bound to prove the unnecessary averments. It was there in-
timated that upon the plea of the general issue it was neces-
sary to prove that every thing had been done which was ne-
cessary to be done before the incorporation became complete ;
but subsequently, in *The Utica Ins. Co.* v. *Tillman,* 1 *Wendell,*
555, it was held that a corporation plaintiffs need only prove
their charter and acts of user under it; and such is the rule now
in this court. If a corporation, when *proceeded against,* is not
bound to prove more than when they *sue as plaintiffs,* it would
not now be necessary to prove more than is averred in the plea
pleaded in this case ; and from the course of pleading adopted
and approved of by the court, in the cases of *The People* v.
*Niagara Bank,* and the other cases in 6 *Cowen,* it would seem
that the plea is sufficient, and that it is competent for the at-
torney general to reply any matter which would shew a fail-
ure on the part of the corportion to comply with the require-
ments of the act creating them. On this point, however, it
does not seem necessary to give any definite opinion, because

ALBANY,
Jan. 1836.

The People
v.
Saratoga and
Rensselaer
R. R, Co.

ALBANY,
Jan. 1836.

The People
v.
Saratoga and
Rensselaer
R. R. Co.

the revised statutes seem to have regulated the proceedings in such cases, and to have adopted the suggestions of the counsel for the crown, in the case of *The King* v. *Amery*, as the correct mode of proceeding. Those statutes provide that an information in the nature of a *quo warranto* may be filed against *individuals* in several cases; one of which is, "When any association or number of persons shall act within this state as a corporation, without being legally incorporated." 2 *R. S.* 581, § 28, *sub.* 3. And a similar information may be filed against *any corporate body* in several cases, when such corporation shall offend against their charter, or any act of the legislature affecting it; or shall have done or omitted any act which shall operate as a forfeiture by misuser, or nonuser, or a surrender; or when it shall exercise any franchise not conferred by law. 2 *R. S.* 583, § 39. By §48 and 49, *p.* 585, the nature of the judgment to be rendered is different in the two different modes of proceeding. Whenever individuals or a corporation shall be found guilty, either of usurping or intruding into any office or franchise, or of unlawfully holding, judgment of *ouster* shall be rendered, and a fine may be imposed; but where the proceeding is against a corporation, and a conviction ensues for misuser, nonuser or surrender, judgment of *ouster* and of *dissolution* shall be rendered: which is equivalent to judgment of *seizure* at common law. If, therefore, the information in this case had for its object to *oust* the defendants from acting as a corporation, and to test the fact of their incorporation, it should have been filed against *individuals*; if the object was to effect the *dissolution* of a corporation which had had an actual existence, or to *oust* such corporation of some franchise which it unlawfully exercised, then the information is correctly filed against the *corporation*. The distinction is well exemplified by Sir Robert Sawyer, in *The King* v. *The City of London, cited in* 2 *T. R.* 522. He says the rule is this: when it clearly appears to the court that a liberty is usurped by wrong, and upon no title, judgment only of *ouster* shall be entered. But when it appears that a liberty has been granted, but has been misused, judgment of *seizure* into the king's hands shall be given. The reason is given: that which came from the king is returned there by *seizure*; but that which never came from

him, but was usurped, shall be declared null and void. Judgment of *ouster* is rendered against *individuals*, for unlawfully assuming to be a corporation. It is rendered against *corporations* for exercising a franchise not authorized by their charter. In such case the corporation is *ousted* of such franchise, but not of being a corporation. Judgment of *seizure* is given against a corporation for a forfeiture of its corporate privileges. The information in this case is therefore not the proper proceeding to call in question the corporate existence of the defendants ; but in so far as it seeks to *oust* the defendants from the exercise of any franchise not granted to them, it is appropriate. When, therefore, an information is filed under the revised statutes against a corporation by its corporate name, the existence of the corporation is admitted ; or rather, that it once had legal existence. This brings me to enquire whether the defendants have the right to build a bridge across the Hudson river at Troy, as a part of their rail road.

The first section of the act incorporates Stephen Warren and such other persons as should thereafter become stockholders, and creates them a body corporate and politic, by the name of "The Rensselaer and Saratoga Rail Road Company," for the purpose of constructing a single or double rail road or way from some proper point in the city of Troy, in the county of Rensselaer, passing through the village of Waterford, in the county of Saratoga, to the village of Balston Spa, in said county of Saratoga. The 13th section declares that it shall not be lawful for the said rail road company to erect any bridge across the Hudson river within two miles of the place where the bridge belonging to the president and directors of the Union Bridge Company is erected, betweeneLansingburgh and Waterford. From these two sections it is clear that the rail road to be constructed from Troy to Balston Spa, passing through the village of Waterford, must cross the Hudson river ; and the clause prohibiting the company from erecting a bridge within two miles of the Union Bridge implies an authority to erect one any where, in the most direct route from Troy to Waterford, more than two miles from the Union Bridge. If the court can be supposed to

ALBANY,
Jan. 1836.

The People
v.
Saratoga and
Rensselaer
R. R. Co.

ALBANY,
Jan. 1836.

The People
v.
Saratoga and
Rensselaer
R. R. Co.

have any knowedge of these localities, either personally, or from public statutes, it must be very clear that a bridge crossing the Hudson, in the route from Troy to Waterford, must be located south of the Union Bridge; and there is nothing in the charter to prevent the company from erecting such bridge directly from a point in the city of Troy to Green Island, as a part of the rail road; and we are, on this occasion, at liberty to infer that the location is not objectionable; otherwise that fact would have been shewn by replication. Had the company built a bridge below the city of Troy, in the direction of the city of Albany, it would, prima facie, not be such a bridge as is contemplated by the charter. In this case it is averred to be in the direct route of such rail road. If there is in the charter no limitation of the authority thus given, the right of the defendants is indisputable. The 13th section already referred to does contain a limitation or qualification as to the manner in which streams are to be crossed. Whenever it shall be necessary, for the construction of their rail road, to cross any stream or water course, it is declared to be lawful for the company to cross the same; "but the corporation shall restore the stream or water course, or road, street or highway thus intersected, to its former state, or in a sufficient manner not to have impaired its usefulness." The defendants, in their plea, claim the right of building a bridge as part of there rail road, and for that purpose of laying abutments and piers in the river, and of placing timbers thereon; but leaving, over the channel, an opening for a draw, to enable vessels to pass and repass the same, "so as to restore the said river to its former state, or in a sufficient manner not to have impaired its usefulness as a public navigable river." This allegation in the plea is in the words of the statute, and is a strict and literal compliance with it. It is also sufficiently explicit to have enabled the plaintiffs to have taken issue upon it, if they had chosen to do so. The plea therefore, contains a full answer to the information, and is good, in form and substance.

The people of the state of New York are the plaintiffs in this case, and by this proceeding have called upon the defendants to show by what authority they assume to do certain acts. It would, in ordinary cases, be sufficient for the de-

ALBANY,
Jan. 1836.

The People
v.
Saratoga and
Rensselaer
R. R. Co.

fendants to show that their acts are authorized by the authority of law and of the plaintiffs. Such an answer, I think, is sufficient in this case; and the defendants can only be properly called upon to answer to some person or persons entitled by a licence to navigate the river, to compensate in damages for obstructing the navigation, or by some other proceeding on the part of such persons to abate the nuisance, if the bridge is such. As, however, the opinion of the court seemed to be desired by both parties upon the constitutionality of the law, if it authorized the erection of the bridge, and as that question was ably and elaborately argued by counsel on both sides, it cannot be improper briefly to express an opinion on the constitutional question.

By the constitution of the United States, art. 1, §8, sub. 3, " The congress shall have power to regulate commerce with foreign nations and among the several states, and with the Indian tribes;" and by sub. 17, " To make all laws which shall be necessary for carrying into execution the foregoing powers, and all other powers vested by this constitution in the government of the United States, or in any department or officer thereof." In February, 1793, congress passed " an act for enrolling and licencing ships or vessels to be employed in the coasting trade and fisheries, and for regulating the same." It has been decided, in the case of *Gibbons* v. *Ogden*, 9 *Wheaton*, 1, that congress has the *exclusive* power of regulating commerce among the several states; that congress has power also to regulate navigation in the waters of the United States, which are also the waters of individual states; and that the statute of 1793 authorizes vessels licensed under it to carry on the coasting trade. In the case of *The Steamboat Company* v. *Livingston*,3 *Cowen*,713, it was decided that the coasting trade means commercial intercourse carried on between different districts in different states; between different districts in the same state, and betwen different places in the same district, on the sea coast or on a navigable river. There can be no doubt, therefore, that the coasting trade may be carried on beyond the bridge in question. The information charges that the Hudson river, from the ocean to the city of Troy, and above it to the villages of Lansinburgh and Water-

ford, is an arm of the sea in which the tide ebbs and flows, and for forty years has been used in carrying on commerce, in pursuance of the laws of the United States. The place, therefore, where the bridge is built, is one which coasting vessels have·a right to pass, and where any obstruction *entirely preventing* or *essentially impeding* the navigation would be unlawful. It is, however, a proposition not disputed, that but for the power granted by the constitution to congress, the state legislatures would have as full and entire control over the waters of their several states, as they have over the land. It follows, therefore, without the declaratory amendment to that effect, that the states reserve all power not granted to congress. The entire sovereignty over the waters of the states, then, vests in congress and the several state legislatures. If this entire sovereignty rested in one government, it could not be doubted that such government might authorize the erection of a bridge across navigable waters, if the business and intercourse of society required such an accommodation. The only objection to the exercise of such a power might be, that the injury to navigation might exceed the benefits to be derived to society otherwise than from such an accommodation ; and on that point the sovereign power must be the judge. It is for the legislature, and the legislature alone, to judge of the expediency of exercising any of its acknowledged powers in any given case. I think I may safely say, that a power exists somewhere to erect bridges over waters which are navigable, if the wants of society require. them, provided such bridges do not essentially injure the navigation of the waters which they cross. Such power certainly did exist in the state legislatures, before the delegation of power to the federal government by the federal constitution. It is not pretended that such a power has been delegated to the general government, or is conveyed under the power to regulate commerce and navigation ; it remains, then, in the state legislatures, or it exists no where. It does exist, because it has not been surrendered any farther than such surrender may be qualifiedly implied—that is, the power to erect bridges over navigable streams, must be considered so far surrendered as may be necessary for a free navigation upon those

ALBANY,
Jan. 1836.

The People
v.
Saratoga and
Rensselaer
R. R. Co.

streams.   By a free navigation must not be understood a navigation free from such partial obstacles and impediments as the best interests of society may render necessary.   For example—a vessel arrives at the port of New York from a foreign port ; congress has the exclusive power to regulate commerce and navigation with foreign nations ; the vessel arrived has sailed under the authority of the laws of congress, but she is met at the quarantine ground—not by a bridge with a draw which she may pass in half an hour, but by a mandate from the state authorities, stating in substance that the conveniences or necessities of the people of the port which the ship is approaching, require that she shall remain at quarantine one, ten, or twenty days, according to circumstances—is such a detention unconstitutional ?   It has never been pretended.   The contrary has been expressly adjudged, as far as that point could be adjudicated in the case of *Gibbons v. Ogden.*   Chief Justice *Marshall* says, 9 *Wheaton*, 203, " Inspection laws, quarantine laws, health laws of every description, as well as laws for regulating the internal commerce of a state, and those which respect turnpike roads, ferries, &c. are component parts of this mass."   He had just spoken of " that immense mass of legislation which embraces every thing within the territory of a state not surrendered to the general government ; all which can be most advantageously exercised by the states themselves."   It is here conceded that inspection laws, quarantine laws, health laws, laws regulating internal commerce, laws which respect turnpike roads and ferries, are constitutional, and are of course no infringement of the powers granted to the general government.   The chief justice adds an "&c." after the word ferries, implying that there were other subjects of a similar nature in his mind, which it was unnecessary to specify—and what is more analogous to a *ferry* than a *bridge,* for which a ferry is but a substitute ?   I have already stated that the general government and the state government, between them, possess the sovereign power ; and the sovereign power may doubtless build bridges where necessary.   It has been correctly said that the federal constitution is a grant of power, while the state constitutions are limitations of power.   There is in our state con-

ALBANY,
Jan. 1836.

The People
v. .
Saratoga and
Rensselaer
R. R. Co.

ALBANY,
Jan. 1836.

The People
v.
Saratoga and
Rensselaer
R. R. Co.

situation no limitation of the power to build bridges, and there is in the federal constitution no grant of such a power. There can be no question, therefore, that the state legislature has the power to build bridges where they shall be necessary for the covenience of its citizens. The right must be so exercised, however, as not to interfere with the right to regulate and control the navigation of navigable streams. Both governments have rights which they may exercise over and upon navigable waters ; and it is the duty of both so to exercise their several portions of the sovereign power, that the greatest good may result to the citizens at large. It is the right and the duty of the general government to adopt such measures that the commerce and navigation of the country shall not be improperly obstructed ; and it is the duty of the state governments to afford their citizens all the facilities of intercourse which are consistent with the interests of the community, and which shall not obstruct the powers granted to the general government. It fortunately happens, that in the particular case now under consideration there is no necessity for collision. The maxim "*sic uture tuo ut alienum non loedas*" is the rule for both governments. A bridge with a draw, which shall be opened free of expense for every vessel sailing under a licence as a coasting vessel, affords all the accommodations necessary for citizens in the vicinity or for travellers, and does not impede the navigation in any essential degree. The case of *Wilson* v. *The Black Bird Creek Marsh Company*, 2 *Peters*, 245, has been cited and relied on by the counsel on both sides as an authority having a bearing upon this case. The company sued Wilson and others in the supreme court of the state of Delaware, in an action of trespass, for breaking a dam erected by them, by the authority of the legislature of that state, across the Black Bird creek—a navigable stream which flowed through a marsh on the banks of the Delaware river. The defendants pleaded that the place where the trespass was committed was part of Black Bird creek—a public and common navigable creek in the nature of a highway, in which the tide flowed and re-flowed ; that they, with their sloop, which was regularly licensed and enrolled according to the laws of the United States, sailed in and upon the creek ;

and because the dam had been unlawfully erected, and obstructed the navigation of the navigable creek, therefore they tore it up, doing no unnecessary damage. The plaintiffs demurred, and the supreme court sustained the demurrer and gave judgment for the plaintiffs. The court of appeals affirmed the judgment. The defendants brought a writ of error to the supreme court of the United States. Mr. Wirt, who argued for the Black Bird Creek Marsh Company, admitted that the creek was navigable and a public highway, but insisted that the legislature of a state may stop a highway. He contended that the stream in question remained under state control, and was not subject to the laws of congress regulating commerce; that there had been no legislation by congress, with which the company had interfered. Chief Justice Marshall says, " The measure authorized by the act stops a navigable creek, and must be supposed to abridge the rights of those accustomed to use it. But this abridgement, unless it comes in conflict with the constitution or laws of the United States, is an affair between the government of Delaware and its citizens, of which the supreme court can take no cognizance ; that if congress had passed any act regulating commerce in those creeks, the court would feel no difficulty in saying that a state law, conflicting with the law of congress, would be void. He says expressly that the power of congress had not been so exercised as to affect the question, and on that ground affirmed the judgment of the state courts. I confess I do not see why the law of congress did not have an operation, if the vessel was navigating under a coasting licence, and was making a voyage for commercial purposes from one place to another in different districts, or in the same district. But we have no concern with the propriety of the decision, so long as the principle is clearly avowed upon which it was decided. According to that principle, the defendants in *this case* would have no right to build an *impassable dam* where they have erected a draw-bridge. The Hudson river is admitted by the pleadings to be a public navigable river ; it is of course subject to the navigation laws of congress, and the bridge can only be justified upon the principles which I have previously endeavored to maintain. There is a material dis-

tinction between a draw-bridge, which detains a vessel for only a short time, and a dam which stops the navigation entirely. The bridge in question with a draw is no greater obstruction than the dam erected by the state a short distance north of the bridge, but still south of the villages of Lansingburgh and Waterford. That dam would be an illegal obstruction but for the lock by which vessels pass it. So would the bridge without a draw ; but having a draw, it is no greater obstruction than the dam with a lock. The dam was built by state authority, to facilitate the internal commerce of the state. So is the bridge to facilitate internal communications and intercourse—both peculiar objects of state legislation. Instances of bridges over navigable waters are very numerous. There are such bridges in the vicinity of Boston, and there is one in the district of Columbia, between Alexandria and Georgetown. Neither the federal government nor the federal judiciary have shown any disposition to act otherwise than with all proper.liberality, in the exercise of the powers granted ; nor can they be justly charged with an inclination to encroach upon the reserved powers of the states. It is not, I apprehend, for the state authorities to go in advance of the federal government, in making a surrender of powers not claimed by the federal government, and which, if surrendered, cannot be exercised at all. In the present case it must be remembered that neither the general government, nor those claiming rights under them, have contested the right to build a draw bridge at Troy. Those who represent the people of the state of New-York raise this objection to a law passed by their own representatives.

I hope I have said enough to vindicate the legislature from any attempt to exercise powers which do not belong to them, and to show that the act to incorporate the Rensselaer and Saratoga Rail Road Company is far from any constitutional objection.

Judgment for defendants on demurrer.