SILLIMAN (BATTEN v.). See Case No. 1,-106.

━━━

## Case No. 12,851.
### SILLIMAN v. HUDSON RIVER BRIDGE CO.
### COLEMAN v. SAME.
[4 Blatchf. 74.] [1]

Circuit Court, N. D. New York. July 25, 1857.

BRIDGES—OBSTRUCTION TO NAVIGATION—DRAWS—PRELIMINARY INJUNCTION.

1. The purpose and object of the bridge across the Hudson river at Albany, authorized by the act of the legislature of New York, passed April 9, 1856, entitled, "An act authorizing the construction of a bridge across the Hudson river at Albany" (Sess. Laws 1856 c. 146), were

---

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]

not simply the transportation of railroad trains, but, in addition, the accommodation of the public in general, in travel and business, by the use of it as a common highway.

2. On a bill filed, alleging that a bridge constructed according to the directions in that act, for the conveyance over the same of trains of railroad cars, and for the accommodation of the travelling and business public in general, would constitute an obstruction of the free navigation of the river, within the meaning of the constitution and of the acts of congress securing a right to the enjoyment of the same, the question presented, on a motion for a provisional injunction, before the erection of the bridge is actually commenced, is, whether a case is presented which calls upon the court to interfere and arrest the erection of the bridge, until an opportunity is afforded for a more full examination of witnesses, and a more mature consideration of the alleged obstruction.

[Cited in Miller v. New York, Case No. 9,585.]

3. In a case of that kind, the work contemplated ought to be promptly enjoined, if there be any reasonable ground for believing that the bridge may finally be held an obstruction, and hence subject to be abated, as the expense and loss to the defendants may otherwise be heavy and ruinous.

4. In the present case, the legal right of the plaintiff to a free and unobstructed navigation of the Hudson river being clear, and the defence being that the bridge contemplated would not substantially obstruct or impede such right, and the court being in doubt whether the erection of the bridge in the mode provided by the act, in connection with the powers conferred in the use of it, would not be a serious or material obstruction to the free navigation of the river, the court enjoined the proceedings in the erection of the bridge, until the final hearing of the case.

[See Baird v. Shore Line Ry. Co., Case No. 758.]

5. The real question in the case stated to be, whether or not, regarding the probable travel and transportation across the bridge by railroad cars and as a common highway, and also the business depending upon the free navigation of the river, up and down, at the place where the bridge is to be erected, the draw or draws provided for will furnish reasonable means to prevent the navigation from being seriously or materially impaired.

6. Another question involved stated to be, how far the personal duties and obligations imposed by the charter of a bridge upon its grantees, to remove obstructions to navigation occasioned by its erection, should be taken into account in determining the question of its lawfulness.

7. Another question stated to be, how far the business of commerce upon the rivers of the country is to yield to the convenience and accommodation of the conveyance of passengers upon railroads.

8. The navigation between different ports upon a public river within the same state, comes within the power to regulate commerce "among the states."

9. The power conferred by the constitution upon congress, to regulate commerce, is paramount to the power in a state to authorize the building of a bridge across a public river navigable from the sea.

In equity. This was an application for a provisional injunction. The plaintiff in the first suit [Robert D. Silliman] was a citizen of Troy, N. Y., engaged in the navigation of the Hudson river from Troy and Albany to New York, with vessels of which he was part owner, enrolled and licensed, under acts of

congress, to carry on the coasting trade. The plaintiff in the second suit [Frederick W. Coleman] was a citizen of Barnstable, Mass., engaged in trade between the port of Barnstable and the ports of Albany and Troy and intermediate places, and between Albany and Troy and Boston and other ports, with a vessel, of which he was master and part owner, enrolled and licensed, under acts of congress, to carry on the coasting trade. The defendants were a corporation created by the state of New York. The bills were sworn to October 2, 1856. This application was made in November, 1856, upon affidavits, before the putting in of the answers to the bills. The injunction prayed for by the bill was to restrain the erection of a bridge across the Hudson river at Albany, on the ground that it would seriously obstruct the free navigation of the river. The defendants claimed the right to erect the bridge under the authority conferred on them by an act of the legislature of New York, passed April 9, 1856 (Sess. Laws 1856, c. 146), entitled: "An act authorizing the construction of a bridge across the Hudson river at Albany." The bill averred that the whole of the capital stock of the defendants had been subscribed, that the site of the bridge had been established, and a certificate of its location filed, under the provisions of the act, and that the defendants were preparing to construct the bridge at such location.

Reverdy Johnson and William A. Beach, for plaintiffs.

Nicholas Hill, Jr., and John H. Reynolds, for defendants.

NELSON, Circuit Justice. The eighth section of the act relied on by the defendants provides for the erection of a bridge, which "shall be constructed at an elevation at least twenty feet above common tide-water, so as to allow under it the free passage of canal boats and barges without masts, and with a draw therein of sufficient width to admit the free passage of the largest vessels navigating the said river, and at least two hundred feet in width, or of two draws of at least one hundred and fifty feet each, which draws shall not be obstructed by piers or otherwise, and in such a manner as to cause no substantial impediment or obstruction to the free navigation of the said river; and the said corporation hereby created shall, at all times during the season of navigation, cause the said draw to be opened, and kept open, except for the passage of railroad trains of cars, and shut whenever the same may be necessary; and boats or vessels wishing to pass such draw, shall, at all times, have a preference over railroad trains of cars or engines, and such draw shall be promptly opened to any such boat or vessel on signal, if given before any railroad train or engine shall have appeared and given signal of their intention to pass." There are other clauses in the act relating to the towing of sailing vessels through the draw, for lights at night on the bridge, and for the removal of sandbars or other obstructions, caused by the erection of the bridge or the piers of the same.

There are some provisions of the charter which would seem to indicate an intent to limit the use of the bridge to the transportation of trains of railroad cars across the river, but, upon a careful perusal of the whole of the act, I am inclined to think that the power conferred upon the defendants is more extensive. The first section, constituting the stockholders a corporation, declares the object to be "erecting and maintaining a bridge for the purposes of railroad travel and transportation across the Hudson river," &c., and the eighth section contains a clause, that the company shall "cause the said draw to be opened, and kept open, except for the passage of railroad trains of cars, and shut whenever the same may be necessary," &c. But the twelfth section provides, that "after the said bridge shall have been completed, such tolls and charges may be collected for crossing the same on foot, and with wagons, cars, or carriages of any kind, and with horses, or other animals, or otherwise, as the directors may from time to time establish," &c., "and any person crossing or attempting to cross said bridge without paying the proper toll, shall be subject to a penalty of ten dollars, in addition to three times the amount of toll such person or persons ought to have paid." This section must be read in connection with the two clauses already referred to, and is significant of the intent and meaning put upon them by the legislature, and very clearly indicates that the purpose and object of the bridge were not simply the transportation of railroad trains, but, in addition, the accommodation of the public in general, in travel and business, by the use of it as a common highway. I shall not stop to reason out this view by collating the various provisions of the charter bearing upon it, but shall content myself by stating it. I think it can be established beyond any reasonable doubt.

The grave question in the case, therefore, is, whether or not a bridge constructed according to the directions in the charter, for the conveyance over the same of trains of railroad cars, and for the accommodation of the travelling and business public in general, will constitute an obstruction to the free navigation of the river, within the meaning of the constitution, and of the acts of congress, which secure to the plaintiff and other citizens a right to the enjoyment of the same. The affirmative is maintained by the plaintiff, and denied by the defendants.

The proofs now before me bearing upon the question, are very voluminous and conflicting. and if I were called upon to determine the case finally upon them, I should feel considerable hesitation and embarrassment.

The question, however, as presented on this motion, is of less weight and urgency, as it is limited to the simple inquiry, whether a case has been presented which calls upon the court to interfere and arrest the erection of the bridge, until an opportunity is afforded for a

more full examination of witnesses, and a more mature consideration of the alleged obstruction.

A preliminary inquiry in this and like cases should especially be made by the party complaining, and the work contemplated be promptly enjoined, if there be any reasonable ground for believing that the bridge may finally be held an obstruction, and hence subject to be abated, as the expense and loss to the defendants may otherwise be heavy and ruinous. A consideration that pressed most strongly upon the court, in passing upon the obstruction in the case of the Wheeling bridge, was the heavy expenditure of the defendants in the erection, and regret was expressed that the judge before whom the application for the injunction was first made, had not enjoined any further proceedings till the great question involved had been finally disposed of. No court can avoid feeling the weight of this consideration, or being considerably influenced by it, in deliberating upon the application for an injunction. A refusal is an encouragement to go on, and may greatly embarrass the determination on the final hearing. The case is very different from the ordinary one, where the only loss or suffering arising from the refusal is that which accrues to the plaintiff. In such cases, if the right is regarded as doubtful, the injunction is usually withheld till the right is established by a trial at law, or on the final hearing. But, in the present and similar cases, not only is the injury to the plaintiff involved, but, also, encouragement to the defendant to go on, leading to heavy expenditures, which the court may feel bound, at the final hearing, to disregard and render useless. These considerations have led the court of chancery in England, especially where the title of the plaintiff is clear but the obstruction is denied, and the case is sent to a court of law for a trial, to accompany the order with an injunction until the hearing after the coming in of the result of the trial at law.

Now, in this case, there is no question as to the title, or, in other words, the legal right of the plaintiff to a free and unobstructed navigation of the Hudson river. This has been secured by the constitution and by the acts of congress under which the right is claimed, and, as I understand it, was not denied on the argument. The defence was placed on the ground, that a bridge constructed as provided for in the charter, would not substantially obstruct or impede this right, but, on the contrary, was consistent with its full enjoyment. It is upon this question that I entertain doubt at the present stage of the proceedings and proofs in the case, and am not prepared to agree with the defendants. I cannot say, as at present advised, that the erection of the bridge in the mode prescribed, in connection with the powers conferred in the use of it, will not be a serious or material obstruction to the free navigation of the river. What the

truth may be upon a more full and thorough development of the facts, it is, of course, now impossible to determine. I speak only of the case as now presented. Many of the facts upon which the question of obstruction must ultimately turn have not been sufficiently attended to by either of the parties. Before the final hearing they will doubtless realize their importance, and present them with more method and accuracy to the court.

In my judgment, the real and turning point in the case is, whether or not, regarding the probable travel and transportation across the bridge by railroad cars and as a common highway, and, also, the business depending upon the free navigation of the river, up and down, at the place where the bridge is to be erected, the draw or draws will furnish reasonable means to prevent any substantial obstruction to such navigation—that is, prevent the navigation from being seriously or materially impaired. Now, this is a question of fact, and in looking at it with a view to an intelligent determination, the extent of the travel and transportation across the bridge must be inquired into. Every railroad train of cars, and every vehicle, animal or person crossing in the course of common highway transportation or travel, will necessarily require the draw or draws to be closed. Then the navigation must, in fact, be obstructed. Will the closing of the draws, for the accommodation of this transportation and travel, be compatible or consistent with the fair use of the river, for the purposes of the transportation of freight and persons, by steam vessels and other water craft, at this point, up and down the same? The data for the solution of this question are not sufficiently before me. It is manifest that the crossing at this point in both directions will be great. Whether the conflict may not be reconciled by means of proper draws, so that each privilege or right claimed may be reasonably enjoyed, it is not for me, at present, to say. Indeed, it is impossible to give any satisfactory judgment in the matter, upon the present proofs in the case.

Some idea of the extent of the business, as confined to railroad trains, may be derived from a perusal of the sixteenth section of the charter. It provides, that "any railroad corporation whose road now has, or shall have, a terminus at, or shall run its trains to or from, said city of Albany, or East Albany, or shall run its trains in connection with any road having such terminus, shall be permitted to use said bridge for railroad purposes, upon such terms as the directors of the several companies interested may agree; and, in case they shall not be able to agree, the terms shall be fixed by the canal board." Under this clause, all the railroads running to and from Albany or East Albany, and all roads running in connection with them, are entitled to the ben-

efit of the use of the bridge. This includes all the several lines of road leading to and from these points now in operation, or that may be hereafter constructed; and, in addition to this use, is to be taken into the account, the use for common travel, as a public highway.

As to the business up and down the river carried on by vessels propelled by steam and sails, some idea may be gathered of the extent of the business, and of the number of passages through the draws, from a fact stated by several witnesses, that at least seven-eighths of all the freight upon the Western and Northern canals, arriving at and leaving tide-water, enters and leaves the Hudson river at West Troy; and to this is to be added the business growing out of the coasting trade carried on with the towns above the bridge.

There is another question involved in this case that I desire to have discussed, namely, how far the personal duties and obligations imposed upon the grantees of the charter of a bridge to remove obstructions to navigation occasioned by its erection, should be taken into account in determining the question of its lawfulness. This assumes that the structure would operate as an impediment to navigation, but that the difficulty could be relieved by the agency of the grantees, as the obstructions occurred. For instance, in this charter, it is made the duty of the defendants to keep in readiness steamtugs to tow sailing vessels through the draw; and it is also provided that they shall not suffer sand-bars to continue, that may be formed by reason of the erection of the bridge or piers, but shall remove the same. Suppose that the draw constructed would not admit of the passage of sailing vessels without the aid of the tug, would this provision of the charter legalize the bridge? Again, suppose it should be admitted that the piers of the bridge would be the means of the formation of bars above and below them, so as to impede navigation, would the duty enjoined upon the defendants in the charter to remove the obstructions, answer the legal objection to the bridge? This question, so far as I know, is new, and, as a general principle, is of very great importance, and may have a considerable bearing upon this case, on the final hearing. The opening and closing of the draw must depend more or less upon human agency. This must necessarily be so, as long as it is admitted that a proper draw may relieve the bridge from obstructing the navigation. The question is, how much farther may such agency be relied on, in cases where the bridge, from its construction, constitutes an obstruction even with the proper management of the draw?

Another question, also, may be involved in the final determination, requiring the most deliberate consideration; and that is, how far the business of commerce upon the river—the great natural highways for the convenience of trade and intercourse—is to yield to the convenience and accommodation of the conveyance of passengers, the chief and primary business and use of railroads. It is undoubtedly true, that railroads furnish very considerable facilities for the transportation of goods as well as of passengers, and deserve the fostering care and encouragement of the government and the country; but it will, probably, not now be denied, after the experience that has been had in the practical use of them, that, in the transportation of goods, especially heavy freight, they cannot compete with the great natural thoroughfares subjected to such use by steam vessels and other water craft. Great care, therefore, should be taken that the facilities thus furnished by a beneficent Providence for the convenience of the business and commerce of the country, should not be so encumbered and obstructed by the erection of artificial means of crossing, as to render them virtually useless for the purposes of navigation. And it is especially important that some general principles should be arrived at in this case, whereby, while the fair and reasonable navigation of the river is secured to the public, every facility consistent with the same may be extended to railroads in their passage across the stream. The principles proper to be applied to this case, will be, generally speaking, applicable to every other instance of bridging this river, and it is apparent that they must so regulate and control the erection of bridges, as that, however multiplied they may be, as the exigencies and business necessities of the country may demand, the reasonably unobstructed navigation of the river may still be maintained. No one can desire to see this great natural thoroughfare seriously obstructed, or its business and commerce materially crippled. The guarantees of the constitution and of the acts of congress, but harmonize in this respect with what must be the feelings and wishes of the whole business community.

A question once presented in this state, in the court of chancery, and in the court for the correction of errors, and decided, namely, whether or not the navigation between different ports upon a public river within the same state comes within the power to regulate commerce "among the states," need not be considered, as no such question has been made by the defendants. The affirmative has been maintained by the highest authority in this state. Steamboat Co. v. Livingston, 3 Cow. 713; People v. Rensselaer & S. R. Co., 15 Wend. 113.

Nor need I examine the question, whether or not the power in the state to authorize the building of a bridge across a public river navigable from the sea is not subordinate to that conferred by the constitution upon congress, to regulate commerce, as no such question has been made in the case. That

the power in congress is paramount was conceded on the argument, as it was, also, in the fullest and broadest terms, by the distinguished judge (Chief Justice Savage), who delivered the opinions of the court in the two cases already referred to.

Upon the whole, on the grounds and for the reasons assigned, I have arrived at the conclusion, that it is due to the rights and interests of the parties, as well as to the questions involved, to enjoin the proceedings in the erection of the bridge until the final hearing of the case.

I would further suggest, that although neither of the parties has furnished me with a copy of an amendment to this charter, made by the legislature since the argument, and pending the consideration of the motion, it has come under my notice; and that, if the charter is to be regarded as a public act, I shall feel bound to consider it at the final hearing. This amendment reduces the width of the draw, if but one, from two hundred feet to one hundred and eighty feet, and if two draws, from one hundred and fifty feet to one hundred and ten feet each. It is true that certain officers named may, in their discretion, direct these draws to be enlarged, but this qualification presents a contingency I cannot notice or attribute any weight to, in passing upon the question involved. It will be for the parties to consider, whether it will not be for the convenience of all concerned that, in the preparation for the final hearing, the amendment of the charter shall be taken as modifying the original act, so as to embrace the whole case in one hearing. Much of the evidence now before me relates to a bridge with the draws as originally prescribed, and, of course, would be entitled to diminished weight when used to uphold the draws as altered in the amendment.

Let an injunction issue according to the prayer of the bill.

[NOTE. This cause was again before the court on final hearing on pleadings and proof. The judges being opposed in opinion (Case No. 12,852), a division of opinion was certified to the supreme court, where the judges of that court were also equally divided. 1 Black (66 U. S.) 582. This court then made decrees dismissing the bills. Case No. 2,983. From those decrees the plaintiffs appealed to the supreme court where the decrees of this court were affirmed. 2 Wall. (69 U. S.) 403.]