SILLIMAN v. HUDSON RIVER BRIDGE CO. See Case No. 2,983.

---

## Case No. 12,853.

SILLIMAN v. TROY & W. T. BRIDGE CO. et al.

[11 Blatchf. 274.] [1]

Circuit Court, N. D. New York. Aug. 16, 1873.

BRIDGES — OBSTRUCTION TO NAVIGATION — COMMERCE AMONG THE STATES.

1. An injunction being asked, to restrain the building of a bridge across the Hudson river, between the city of Troy and the village of West Troy, on the ground that the bridge would essentially obstruct the navigation of the river, and would interfere with the use by the plaintiff of vessels owned by him, enrolled and licensed for the coasting trade by the United States, the court held, as matter of fact, on the evidence, that the erection of the bridge, as proposed, with piers, would not create shoals or bars, and that, with two draws, each 111 feet wide in its opening, and with an elevation of 32 feet above ordinary tide-water, the bridge

---

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]

would not materially obstruct the navigation of the river, and that the injunction must be refused.

[Cited in Miller v. New York, Case No. 9,-585; Ormerod v. New York, W. S. & B. R. Co., 13 Fed. 372.]

2. The cases reviewed, on the subject of when a bridge over a navigable stream will be regarded as an interference with commerce among the states.

[This was a bill in equity by Charles A. Silliman against the Troy and West Troy Bridge Company and others.]

Motion for a preliminary injunction, to restrain the defendants from proceeding in building a bridge across the Hudson river, between the city of Troy and the village of West Troy, and was founded upon the pleadings and affidavits.

William A. Beach and Robert H. McClellan, for plaintiff.

Roscoe Conkling and Esek Cowen, for defendants.

HUNT, Circuit Justice. The bill of complaint in this case was filed in October, 1872. It alleges the passage of an act by the legislature of the state of New York, in April, 1872, authorizing the construction by the defendants of a bridge across the Hudson river, from the foot of Congress street, in the city of Troy, of not less than thirty feet elevation above ordinary tide-water, with a draw of sufficient width to allow of two openings therein, of not less than one hundred feet in width, and sets forth the whole of the act on the subject. It alleges, that the plaintiff is a citizen of the state of New Jersey, and is part owner of the barge St. Nicholas, and of the canal-boat Amelia Curtis; that the barge and the canal-boat are duly enrolled as United States vessels, and licensed to carry on the coasting trade, and are engaged in that trade; that Troy is a port of delivery; that the tide ebbs and flows in the Hudson river above Congress street, and in front of the whole city of Troy; that the bridge company have contracted with the other defendants to build the bridge; and that they intend to erect the same, and are proceeding in the construction thereof. The bill describes the character of the river, its channels and commerce, and the vessels engaged in it, the city of Troy and its surroundings, and charges that the proposed bridge will essentially obstruct the navigation of the river, and will materially hinder the complainant and others from using it as they have been accustomed to do, will interfere with the use of the licenses to the plaintiff, will hinder the subjects of foreign countries in the exercise of their rights of navigation, and will interrupt trade, commerce, and navigation, to the common nuisance and irreparable injury of the complainant and other citizens of the United States. The bill further alleges, that bars and shoals will necessarily be formed by the piers of the bridge, that the United States own extensive and costly

works on the Hudson, opposite Troy, and have expended large sums in improving the navigation of the river, and that there is no public necessity for the bridge, concluding with a prayer that the act authorizing the construction of the bridge may be declared unconstitutional and void, and that the defendants may be restrained from erecting the same, unless placed at a height sufficient, at all stages of the water, to permit the passage of vessels with their masts and chimneys standing, and that a preliminary injunction may issue.

The answer was verified on the 30th of December, 1872, and served at about the same time. It is not necessary here to detail its contents. Affidavits in support of, and in opposition to, the motion are also read.

The parties differ in their views of the law applicable to this subject. They differ largely as to the effect that it is supposed will be produced by the erection of the bridge. As to the facts as they exist at this time there is no great difference between the parties. They are substantially as follows: At the point in question the Hudson river is 672 feet in width, and the tide rises and falls about two feet. The bridge is to be built upon three piers, all of which cover the space of forty-two feet in width, leaving a clear space of 630 feet. The pivot or drawpier in the middle of the river is twenty-eight feet in width, and is built in form of the letter V, with the pointed end up the stream. On each side of this pier there is to be a draw, and an opening 111 feet wide, and the elevation of the entire bridge is to be 32 feet above ordinary tide-water. Considerable progress has been made in the construction of the bridge, and there has been expended in such construction, and in procuring materials intended for such construction, the sum of $150,000. At a distance of about one-half mile above the proposed bridge is the bridge of the Rensselaer & Saratoga Railroad Company, on the same river, which is also used as a highway bridge. A short distance further up the stream is the state dam, extending entirely across the river and entirely closing the same to boats and vessels except by the use of a lift-lock at the easterly end thereof. Six miles below, at the city of Albany, are two other bridges across the same stream, used exclusively for railroad purposes, the one having been in use for eight years and the other for two years. One of these bridges has its two draws of the width of 117 feet each, and the other of 111 feet each, and said bridges have an elevation of 30 feet only above ordinary tide-water. The usual landing place for the passenger steamers between Troy and New York is about nine hundred feet above the proposed bridge. One entrance into the river from the Erie canal is 700 feet above the bridge, and there is another entrance some distance below it.

Troy is a flourishing city of 50,000 inhab-

itants, connected in commerce and social intercourse with the city of Cohoes, and the villages of West Troy and Lansingburgh and Waterford, and has a commerce upon the river above and below the bridge, by means of steamers, barges, canal-boats and sail vessels. I do not deem it necessary to be more precise as to the extent of this commerce. If this commerce is illegally excluded from the river, or is materially and illegally interfered with, there is enough of it, in any view of the case, to sustain this action and this motion. If this injury is not sustained, or is not occasioned in a manner forbidden by law, it cannot, of course, be important whether it is large or small.

The plaintiff is a part owner of a barge and a part owner of a canal-boat, both of which are registered and, under licenses from the United States authorities, are engaged in the navigation and commerce of this river between Troy and points upon the river farther down the stream.

The matters of fact above stated are undisputed. The points of fact in dispute are these: (1) Whether, above or at the intended bridge, the current of the river runs westerly from the Troy bank towards the other shore, thus striking the middle pier upon its broader side, instead of meeting the sharp point of the pier, as intended, and as is alleged to be the fact by the bridge company; and (2) whether bars and shoals will be formed above and below the piers of the bridge, by the existence of such piers, whereby the navigation of the river will be essentially impaired. This is a matter of science or of speculation as to a future occurrence, rather than a dispute as to the existence of a present fact.

On the first point, viz., of the course of the current at a point above the bridge, Luther Eddy, Daniel Hartnett, Lewis D. Deming, Francis Teson and H. Swartwout testify, in substance, that the current runs diagonally across the river from the eastern to the western shore, and give their opinion that the necessary effect of this current against the pier will be to form shoals and bars. They differ, however, upon the point as to where the current commences to change its course. Hartnett says, that the change commences below the new bridge, while the most of the others state that the change commences at the bridge. I can not but think that the effect of the change of current at a point at or above the bridge must be different from that occurring at a point below the bridge. In the latter case, the running water would be carried clear of the piers, and the liability to create shoals or bars would not exist, or would be less than where the water should come directly against the piers. The effect of the plaintiff's affidavits is weakened by this diversity. The statement is also directly denied by the affidavits of Mr. Fuller, an engineer; Mr. Robinson, who is engaged in the transportation business; Mr. Mosher, who is in the same business; Mr. Vandecar, a pilot

and captain; and Mr. Burdett, who was engaged for many years, under the direction of the legislature, in improving the navigation of the Hudson river near Albany and Troy. Each of these persons testifies that the divergence of the current at or above the bridge is very slight, and that it runs almost directly parallel to the Troy docks. Upon this evidence, I must hold that there is but a slight divergence of the current at or above the bridge from its general direction, and that the centre pier would meet the current almost directly upon its pointed end.

2. Many affidavits are introduced upon each side of the question, whether the building of this bridge as described, will create shoals or bars in the river, above or below the bridge. On the part of the plaintiff, Luther D. Eddy, who has been a civil engineer for forty years, is of the opinion that the piers of the bridge "would tend to the formation of shoals, not only immediately below the piers, but for a very considerable distance, and even for miles, below them." He is also of the opinion that a shoal will be formed above the middle pier, which will extend to and connect with an existing shoal on Centre Island, a short distance above the bridge, and that a shoal will also be formed southerly and westerly of the pier, which will tend to fill up the channel in front of, and will seriously injure, the docks at West Troy.

Daniel Hartnett, who runs a ferry across the river, testifies, that he has for many years been well acquainted with the river, and is of the opinion that a shoal will be formed above the pier, which will be liable to connect with the shoal at Centre Island, and thus prevent the crossing of boats above the bridge.

Francis Teson, who is a pilot and master of a passenger steamer on the river, testifies that he is well acquainted with the river and its navigation, its tides and currents, and that, in his opinion, the building of the pier will destroy steamboat navigation above it, and that a shoal will be formed which will connect with the Centre Island shoal. He is also of the opinion that the "shoal which will necessarily be formed below the pier, will tend, by causing eddies and back-water, to fill up the river with deposits," and that shoals will be formed for a considerable distance below the bridge.

Mr. Deming, a pilot and master of a passenger steamer, expresses the same opinion and in similar language. He also states, that, in the summer of 1871, his steamer grounded under the draw of the upper bridge at Albany, and where the water, before the erection of the bridge, had been of abundant depth; and that a shoal of seven feet in thickness was formed in about six hours.

Mr. Shook, another pilot and master, expresses the same opinion. He further says, that he has observed the formation of shoals in the river at high water, at low water, and at ordinary water, and remembers the grounding of the steamer spoken of by the last witness, in 1871, in seven one-half feet of water, and the formation of a shoal about her, of seven feet in thickness in a few hours.

Mr. Swartwout, employed for some years as a pilot and navigator on the river, also expresses the like opinion as to the formation of shoals by the intended bridge.

These are the opinions of practical men, and, so far as opinions are to be weighed, must be duly considered. It will be observed, that but a single fact is stated in any of these affidavits, viz.: the occurrence, and the effect, of the grounding of Captain Deming's steamer, in 1871, under the draw of the upper bridge at Albany, where he says there was previously a sufficient depth of water. This apparently striking fact loses its significance when we reflect that, although Captain Deming had carried his vessel through this draw twice every day, in the navigating season, for many years before the occurrence, and for two years afterwards, the grounding never occurred on any other occasion. It seems clear, that the grounding was from a cause temporary and exceptional, and not from the existence of the piers. They have been in the same place for eight years past, and, if the bar was caused by their existence, it would have been of frequent occurrence, if not permanent in its character. Yet, of all the vessels passing this draw, including that of Captain Deming, none other is shown to have met with the difficulty, and it never happened to Captain Deming except on this single occasion. The affidavit of Levi Smith contains an explanation of the occurrence, which may sufficiently account for the existence of a temporary bar. Captain Deming and Captain Shook testify, that, in a few hours after the grounding of the vessel of the former, a large shoal formed about her, of the thickness of several feet. There is no statement of whether the vessel laid across the channel, or what extent of surface she presented to the current. I can well conceive, that a vessel lying across this draw would present an obstruction which would cause the formation of shoals and bars to an extent that would soon fill up the channel. I can also readily believe, that the sinking of a large steamer of 40 or 50 feet in width, in a channel of one hundred and eleven feet wide, whatever her position, would be the cause of shoals and bars in the channel above and below the vessel. But, these facts and these concessions have but little influence on the case as it is actually presented, where there is a free current of one hundred and eleven feet in width on each side of a pointed pier.

In opposition to the opinions presented in the moving affidavits, are numerous opinions of witnesses presented in the opposing affidavits. William J. McAlpine testifies, that he has been a civil engineer for forty-six years, engaged in constructing railroads, canals, and harbor and river improvements, has been chief engineer of the state of New York, has held many similar public positions, which are

specified, has planned and constructed many bridges, observed the effect produced on streams by building piers, constructed the tide locks on this river above Troy, removed the bars at Castleton below, and knows of more than one hundred bridges in the United States over navigable streams; that he is familiar with the location in question, and is of opinion, that, if properly constructed, the proposed bridge will be no substantial impediment to the navigation of the river, and will produce no effect in causing bars in the river; and that he has examined the affidavits of Eddy and others, and is of opinion that their apprehensions in regard to forming bars in the river above and below the bridge, and especially that a bar may be formed connecting with Centre Island shoal, are totally without foundation. Mr. McAlpine gives at length the reasons for his opinions.

Charles L. Fuller, an engineer for twenty years, and for many years connected with the city of Troy and with West Troy, as an engineer, holds the same opinion, and for the reasons given by him.

Robert Robinson, for many years engaged in the transportation business on the river, testifies at great length upon all the material points in the case, including that now under consideration, and to the same effect. Richard Vandecar, of the same occupation, Alfred Mosher, in the same business, Silas Betts, Hiram Tinslair, Lewis Rousseau, John J. Winne, D. W. Talcott, H. D. Finch, D. A. Rousseau, C. D. Rousseau, James E. Craig, James Kerslake, William Andrews, Jonathan Freeman and George C. Burdett, all testify, that, in their opinion, no bars or shoals will be formed by the building of the piers in question.

Upon this point, as well as upon that of the direction of the current, important evidence is given by Mr. Howard Ellis, who is the designer and superintendent of the erection of the proposed bridge. He says that the piers have been carefully located parallel with the current of the water, and that there is no perceptible divergence of the current from the east bank of the river. He testifies that the theories respecting the formation of bars are entirely erroneous, and shown to be so by the experience of the Albany bridge, and that, instead of forming bars, the tendency will be to scour out the bed of the river.

The preponderance of numbers in the defendants' favor is not, in my opinion, so conclusive as is the testimony afforded by the experience of the Albany bridges. On the point of the formation of shoals and bars, and the immateriality of the obstruction necessarily arising from a bridge with draws, the results are clearly in favor of those advocating the existence of a bridge. The time occupied in passing a vessel is from two to four minutes, and tugs are provided to aid in the passage. It cannot be denied, that the existence in the river of any material substance, whether fixed or floating, whether occupying hundreds of feet or but one foot, is, in the broadest use of language, an obstruction. This is not, however, what is meant, in law, by an obstruction of navigation. This will be defined in the cases which I shall presently cite. Upon the evidence before me, and upon the evidence derived from the bridges upon the same stream six miles below, I am of the opinion that the erection of the bridge in question will not materially obstruct the navigation of the Hudson river.

This river is a great highway of commerce. All peoples and all individuals, as a general rule, have the right to sail up and down its waters, with their persons and their property. Neither state nor individual may lawfully prevent this passage and this use. This stream, however, is for the use of the state of New York and its citizens, at least equally with the citizens of other states and other countries. The right to cross the stream is equal to the right to sail up or to sail down it. Those living on its banks cannot be prevented from using it for this purpose. I see no conflict in these rights. Each must be preserved. Neither can be so exercised as to cut off the others. The Jerseyman may sail up the river. The New Yorker may cross it, in his boats or by his bridge, in his wagons or his railroad cars, but the bridge must be so built as not to cut off the up or down passage of those who desire so to use it.

Neither do I see a necessary conflict of right or jurisdiction, in the fact that New York owns the entire bed of the Hudson river from its source to its mouth, including that portion opposite to the state of New Jersey (1 Rev. St. N. Y. p. 65, marg.), and the fact that congress possesses exclusive power to regulate commerce on the navigable waters of the country. The regulation of commerce, strictly, is a power vested exclusively in congress. The regulation of many matters incidentally connected therewith is not exclusive in its character, such as pilot, health and quarantine laws. Cooley v. Port Wardens, 12 How. [53 U. S.] 299. Of the same nature is the power to use and control a stream for the benefit of the citizens of the state in which it may be, to establish ferries, authorize bridges, fisheries, &c. This power is not inconsistent with the other, but is subordinate to it, and, when and so far as congress does not act, may be legally exercised. Gilman v. Philadelphia [3 Wall. (70 U. S.) 713].

The matter we are considering has been the subject of frequent judicial consideration. I shall refer to a portion only of the authorities presented in the learned and elaborate arguments made before me.

The fundamental principles by which this class of cases is governed were laid down in Gibbons v. Ogden, 9 Wheat. [22 U. S.] 1. The brief head note of that case is this: "The acts of the legislature of the state of New York, granting to Fulton and Livingston the exclusive navigation of all the waters within the jurisdiction of that state, with boats moved by fire or steam, for a term of

years, are repugnant to that clause of the constitution of the United States which authorizes congress to regulate commerce, so far as said acts prohibit vessels licensed according to the laws of the United States, for carrying on the coasting trade, from navigating the said waters by means of fire or steam." The constitutional power which was in that case, as in this, in question, is in the words following: "Congress shall have power to regulate commerce with foreign nations, and among the several states, and with the Indian tribes." It appears, from the opening argument of Mr. Webster (page 4), that New York had enacted that no person should navigate the Bay of New York, the North river, the Sound, or the lakes, by steam vessels, without a license from the grantees of the state of New York, under a penalty of forfeiture of the vessel. By the law of the adjacent state of Connecticut, no person was permitted to enter her waters with a steam vessel having such license. By the law of New Jersey (across the North or Hudson river), if any citizen of that state should be restrained from using steamboats between the ancient shores of New Jersey and New York, he was entitled to an action for damages in the state of New Jersey, with treble costs, against the parties impeding him under the law of New York. This was called an act of retortion. Great confusion and embarrassment was thus likely to arise from this conflicting legislation, and the interests of commerce and navigation were likely to be seriously affected. The case was elaborately argued and carefully considered. In reaching its conclusion, the court decided: (1) That the word "commerce" was not limited to trade or traffic, but included the navigation of the rivers, bays and harbors of the several states, and the intercourse between nations or citizens, connected with such navigation. (2) That this constitutional power was not limited to the external bounds of a state, but extended to the interior thereof, when the citizens of other states were claimants of the use, but not to cases between man and man in a state, or between different parts of the same state, not extending to or affecting other states. (3) That, unlike the power to lay and collect taxes, the power to regulate commerce is, in its nature, exclusive in congress, incapable of division, and that no part of it can be exercised by a state. Inspection, quarantine and health powers are exercised by the states upon a different principle and under a different power. (4) That the act of congress of 1793 "for enrolling or licensing ships or vessels to be employed in the coasting trade or fisheries, and for regulating the same," and the license issued by virtue thereof, was an exercise of its power by congress, and gave to the holder of such license the right to sail from port to port, to engage in trade at such ports, or to carry passengers to and from the same. The lapse of a half century has not impaired the influence of this decision. Repeated decisions of the supreme court of the United States have recognized and confirmed the authority of this case, and this so lately as at the last term of that court. Case of the State Freight Tax, 15 Wall. [82 U. S.] 232; Morgan v. Parham, 16 Wall. [83 U. S.] 471.

In State of Pennsylvania v. Wheeling Bridge Co., 13 How. [54 U. S.] 518, the power of a state to authorize a bridge over a navigable river was distinctly presented. It was there decided, that the Ohio was a navigable stream, subject to the commercial power of congress, and that the state of Virginia could not lawfully authorize the erection of a bridge over it which would obstruct its navigation. The bridge there in question was a single span, about 980 feet in length, which would not allow the passage under it of large steamboats or sail vessels, and was not provided with draws or openings. It was condemned by the court, and ordered to be removed, unless the defendants, by a day named, should open an unobstructed passage through the channel of the river. This, it was held, might be done by the erection of a bridge which, for the space of 300 feet over the channel of the river, should have an elevation of 111 feet above low water mark (page 578). In delivering the opinion of the court, Mr. Justice McLean says: "If the obstruction be slight, as a draw in a bridge, which would be safe and convenient for the passage of vessels, it would not be regarded as a nuisance, where proper attention is given to raise the draw on the approach of vessels" (page 577). It was suggested, that a draw might be constructed in a bridge over the western channel of the river, which would give a sufficient passage. A plan was subsequently presented for this drawbridge, having two spaces of 100 feet each in the clear, which was deemed sufficient by the court, and, being acceded to by the parties, the bridge, as constructed over the main or eastern channel, was allowed to stand (pages 619, 627).

The case of Willson v. Blackbird Creek Marsh Co., 2 Pet. [27 U. S.] 245, had been decided before the Case of Wheeling Bridge Co., and after that of Gibbons v. Ogden. The state of Delaware had authorized the building of a dam across the Blackbird creek, a sluggish stream, in which the tide ebbed and flowed. The defendant, navigating his enrolled sloop under a United States license, for the purpose of passing the dam, tore it down. The court held, that the state had power to authorize the dam, and that the defendant was a trespasser in his action. The opinion in this case was delivered by the same eminent chief justice who delivered the opinion in Gibbons v. Ogden, and was declared by the court in the Wheeling Bridge Case not to be in conflict with that case, which was recognized as authority. I concede the authority of the case, on the ground that it does not appear that the defendant's vessel was bound to a port of entry above

the dam, or that there was any such port above the dam. Had those facts existed in the case, the decision would have been in hostility to all the other cases on the subject. It would authorize the state of New York to build a dam across the Hudson at Troy or at Poughkeepsie, over or through which not a fish could make its way, much less a steamboat or a sailing vessel. The extent of draws or the height of bridges would be no longer a subject of consideration. I can not consider the case as authority to that extent.

The case of Gilman v. Philadelphia, 3 Wall. [70 U. S.] 713, was decided in 1865. In that case, a bridge of the height of thirty feet above the water, with no draw or opening, over the Schuylkill, a tidal stream, entirely within the state, and having a large amount of coal commerce, was about to be erected under the authority of the state of Pennsylvania. A bridge over the same stream, and about 500 feet lower down, had stood for many years, and yet remained. The plaintiff was a citizen of New Hampshire, and an owner of valuable dock property on the river above the proposed bridge. The court maintained the legality of the proposed erection, holding that it was within the principle of the Blackbird Creek Case; also, that, congress not having acted on the precise subject, the state had concurrent jurisdiction over it; also, that the importance of the commerce up and down the river, and that across the river, were the proper subjects of consideration by the municipal authority, and that its decision on that point was conclusive. Mr. Justice Clifford delivered a dissenting opinion, which was concurred in by Justices Wayne and Davis. A strong circumstance to sustain this case is found in the fact of the previously existing bridge, by which all commerce except that of low coal barges had, for many years, been excluded from the river. This case, however, and the Passaic Bridge Case, 3 Wall. [70 U. S.] 782, in their reasoning, stand very much on the principle of the Blackbird Creek Case, above considered. Neither in the Passaic Case nor the Gilman Case was the action brought by an owner or navigator of a vessel, or one having a coasting license, but by a plaintiff who was owner simply of a dock of wharf on the river bank. In the Passaic Case, also, the bridges were required to have two draws of sixty-five feet each, for the passage of vessels. The learned judge who gave the decision at the circuit in the latter case, lays down the position, that a state may, by a bridge or dam, close the navigation of a tidal river lying wholly within its own territory. This proposition was not involved in the case of the Passaic bridges, nor is it involved in the present case. When it is distinctly presented, it will be necessary to decide it. The affirmance of the decree by a divided court simply affirmed (giving to it the effect claimed by the defendants' counsel) that a bridge with two draws of sixty-five feet each, under the circumstances described, did not constitute a material obstruction to the navigation of the Passaic river.

Of all the instances of bridging rivers, that of the Albany bridge, or rather of the bridges, is the most satisfactory, both as to the facts and as an authority upon the law. Silliman v. Hudson River Bridge Co. [Case No. 12,851]; Silliman v. Hudson River Bridge Co. [Id. 12,852]; [Silliman v. Hudson River Bridge Co.] 1 Black [66 U. S.] 582; [Albany Bridge Case] 2 Wall. [69 U. S.] 403. The case was presented in 1856, and finally decided in 1864. The character and particulars of the bridges have been already stated, and it is sufficient to say, that the erection of this bridge was justified, that it has not only stood since that time without complaint of interference, but that another one of the same character has been built a short distance below it, and, so far as it appears, without objection by any one. I think that it is safe, also, to say, that the bridge has produced none of the evils that were predicted. Commerce continues, trade increases. Albany improves, while Troy becomes more rich and prosperous than before. Shoals and bars are not increased by it, and navigation finds no greater hindrances than existed before the bridges were erected.

I do not understand that there is any conflict among the cases in the United States courts, in relation to bridges with suitable openings, neither is there in the courts of New York. The judgment of that state was expressed many years since, in an able and learned opinion of the supreme court, by Savage, C. J., in People v. Rensselaer & S. R. Co., 15 Wend. 113. He says: "The state legislature has the power to build bridges where they shall be necessary for the convenience of its citizens. The right must be so exercised, however, as not to interfere with the right to regulate and control the navigation of navigable streams. Both governments have rights which they may exercise over and upon navigable waters; and it is the duty of both so to exercise their several portions of the sovereign power, that the greatest good may result to the citizens at large. * * * It fortunately happens, that, in the particular case now under consideration, there is no necessity for collision. The maxim 'Sic utere tuo ut alienum non lœdas,' is the rule for both governments. A bridge with a draw which shall be opened free of expense for every vessel sailing under a license as a coasting vessel, affords all the accommodations necessary for citizens in the vicinity, or for travellers, and does not impede the navigation in any essential degree." He further says: "The Hudson river is admitted by the pleadings to be a public, navigable river; it is, of course, subject to the navigation laws of congress, and the bridge can only be justified upon the principles which I have previ-

ously endeavored to maintain. There is a material distinction between a drawbridge, which detains a vessel for only a short time, and a dam, which stops the navigation entirely. The bridge in question, with a draw, is no greater obstruction than the dam erected by the state a short distance north of the bridge. That dam would be an illegal obstruction but for the lock by which vessels pass it. So would the bridge without a draw; but, having a draw, it is no greater obstruction than the dam with a lock."

I do not consider the question of the necessity of this bridge. This is a political and not a judicial question. If the state may authorize its erection, if the bridge is necessary to the public interests, it is for the state alone to say whether that necessity exists. The state has so declared, and no further inquiry is needed on the point. Gilman v. Philadelphia, supra.

I hold it to be established by the evidence, and by the experience of the two bridges over the same stream at Albany, (1) That the bridge of the height and with the openings proposed will not materially obstruct or hinder the commerce upon the Hudson river at or above Troy; (2) that there is no good reason to apprehend the formation of shoals or bars, by which the navigation will be injured. I am of the opinion, therefore, upon the authority of the cases discussed, that the proposed bridge will not be an interference with the commerce among the states, which will justify this court in prohibiting its erection.

The motion for a preliminary injunction is denied, with costs.