## Case No. 16,601.

UNITED STATES ex rel. HALL et al. v. UNION PAC. R. CO.

[4 Dill. 479; [1] 9 West. Jur. 356; 7 Chi. Leg. News, 282.]

Circuit Court, D. Iowa. May Term, 1875. [2]

EASTERN TERMINUS OF THE UNION PACIFIC RAILROAD COMPANY—POWER OF COMPANY TO BRIDGE THE MISSOURI RIVER — MANDAMUS TO COMPEL THE COMPANY TO OPERATE ITS WHOLE LINE.

1. The charter of the Union Pacific Railroad Company (12 Stat. 489, § 12) required its Iowa

[1] [Reported by Hon. John F. Dillon, Circuit Judge. and here reprinted by permission.]

[2] [Affirmed in 91 U. S. 343.]

branch to be constructed westward from a point on the western boundary of the state of Iowa, to be fixed by the president of the United States. *Held*, on a consideration of various provisions of the charter, that the eastern terminus of said branch was on the Iowa shore of the Missouri river, and not on the Nebraska shore, nor at a point "on the middle of the main channel" of the river, although that was the legal western boundary of the state of Iowa.

2. The right to erect a bridge across the Missouri river to the eastern terminus of the Iowa branch on the Iowa shore, was given to the Pacific Railroad Company by implication in the original charter of the company, and was expressly conferred by the ninth section of the amended charter of the company, of July 2, 1864 (13 Stat. 356). The powers given and the duties imposed by those acts in respect to bridges, were recognized, increased, and regulated, but not repealed, by the special act of February 24, 1871, entitled "An act to authorize the Union Pacific Railroad Company to issue its bonds to construct a bridge across the Missouri river at Omaha, Nebraska, and Council Bluffs, Iowa" (16 Stat. 430).

3. This last named act, construed in connection with the other legislation of congress, was held not to change the eastern terminus of the Iowa branch of the Union Pacific Railroad Company from the Iowa shore of the Missouri river, nor to disconnect the bridge from the road of the company, so as to relieve the company from the duty imposed by its charter and other acts of congress, to operate its whole railroad as "one continuous line."

4. A peremptory mandamus to compel the Union Pacific Railroad Company to operate its road over the bridge in the same general manner that it operates the other portions of road was granted, and the device of a separate transfer over the bridge by local trains held to be in violation of the duty of the company to the public.

5. Amendments in form and in substance may be allowed in mandamus proceedings, in any stage thereof where justice will be thereby promoted: in this case the alternative writ was amended, by leave of court, by striking out part of its mandate, and the peremptory writ, instead of being denied because the alternative writ was too broad, was ordered to be issued in conformity to the alternative writ as amended.

[Cited in U. S. v. Johnson Co., Case No. 15,-489.]

On motion for a peremptory writ of mandamus. This is a proceeding by mandamus, to compel the Union Pacific Railroad Company to operate its road as a continuous line, by running its regular through trains to and from the Iowa shore of the Missouri river, at a point within the limits of Council Bluffs, in the state of Iowa, and which point the relators claim to be the eastern terminus of the road. On the other hand, the company insist that the eastern terminus, that is, the legal as well as actual terminus of the company's road proper, is on the western shore of the Missouri river, at a point within the corporate limits of the city of Omaha, in the state of Nebraska. Between the Iowa shore and the Nebraska shore the company has constructed a railway bridge, the eastern end of which and the approaches thereto are within the city of Council Bluffs, while the western end and the approaches thereto are

within the limits of the city of Omaha. The western end of this bridge is near the passenger depot of the company in Omaha, and the rails of the company's road are extended or prolonged over the bridge, so that the company could, if it desired, run its regular trains each way, without change, over the bridge. The bridge is located about two miles south of the point in section 10, township 15, range 13, known as the initial point of the actual construction, but the road between that point and the machine shops of the company in Omaha has been taken up and abandoned. The company, instead of running its regular trains to and from the Iowa side of the river, stops them at and starts them westward from Omaha, and it crosses passengers and freights over the bridge by means of separate and distinct trains, called "transfer trains," under the management of a "Bridge Transfer Company," an organization of its own employés, charging therefor special rates, viz., fifty cents for each passenger, and ten dollars for each car, and keeping a separate account of the earnings of the bridge. Through passengers and freights, each way, cross the bridge by the agency of this transfer company. Passengers from any of the Iowa roads terminating in Council Bluffs, or at or near the eastern end of the respondent's said bridge, intending to go west by the respondent's road, instead of getting directly on the regular train of the respondent, are required to get on a local or transfer train, and, on arriving at Omaha, to change to the regular train of the company, which is made up and operated from the company's depot in that place. And a like change is necessary to be made by passengers on the respondent's road arriving at Omaha from the west and going east. The present proceeding is instituted by the relators under the act of congress of March 3, 1873 (17 Stat. 509, § 4, last clause), which provides that "the proper circuit court of the United States shall have jurisdiction to hear and determine all cases of mandamus to compel said Union Pacific Railroad Company to operate its road as required by law."

The relators claim, under the various provisions of the acts of congress applicable to the respondent, that it is bound to operate its regular through trains over the bridge to and from the Iowa side, and that operating the bridge in the manner stated, through the agency of the transfer company, is in violation of the acts of congress. Indeed, the relators claim that the bridge is, in fact, an integral part of the railroad of the company, and must be operated as such, and that the company has no legal right to exact or charge special rates or tolls for freights or passengers carried thereon. The alternative writ of mandamus (upon which, and the return and answer thereto, relators now move for a peremptory writ), commanded "the Union Pacific Railroad Company to operate the whole of its railroad from Council Bluffs westward,

including that portion of its road between Council Bluffs and Omaha, and constructed over and across the said bridge, as one continuous line, for all purposes of communication, trade, and transportation; and especially to start its regular through freight and passenger trains westward-bound from Council Bluffs, and to run its eastward-bound trains of both descriptions through and over the said bridge to Council Bluffs, and to operate its said trains to and from Council Bluffs under one uniform time schedule and freight and passenger tariff with the remainder of its said road, and to wholly desist and refrain from operating said last mentioned portion of said road as an independent and separate line, and from causing or requiring freight or passengers, bound westward or eastward, to be transferred as aforesaid at Omaha," or that the company appear, to show cause to the contrary. The company has appeared, and for cause shows substantially the facts herein stated.

The Union Pacific Railroad Company was chartered by congress July 1, 1862 (12 Stat. 489). The 1st, 7th, 8th, 9th, 12th, 13th, 14th, and 17th sections—and particularly the 12th and 14th—bear upon the present controversy. The act provided for a main trunk line to run westward from a point on the 100th meridian, at which point it was to connect with branch roads converging there; the northern one having its eastern terminus at Sioux City, Iowa; the southern, at the mouth of the Kansas river, on the south side thereof; and the central (the one here in question), "from a point (section 14) on the western boundary of the state of Iowa, to be fixed by the president of the United States." On the 17th day of November, 1863, President Lincoln, by an executive order, fixed "so much of the western boundary of the state of Iowa as lies between the north and south boundaries of the United States township within which the city of Omaha is situate, as the point from which said line of railroad shall be constructed." But this point is indefinite north and south, as the township was six miles in length, and on March 7, 1864, the same president, "on the application of the company," did "designate and establish such first above named point on the western boundary of the state of Iowa, east of and opposite to the east line of section 10, township 15, range 13, in the territory of Nebraska." The legal western boundary of the state of Iowa is "the middle of the channel of the Missouri river." 9 Stat. 52. On the 2d of July, 1864 (13 Stat. 356), the charter of the company was materially amended, by giving to the company increased aid in lands and bonds, and by several specific provisions. The original charter contained no express provisions as to bridges. The amended charter (section 9) on the subject was as follows: "That, to enable any one of said corporations to make convenient and necessary connections with other roads, it is hereby authorized to establish

and maintain all necessary ferries upon and across the Missouri river, and other rivers which its road may pass in its course, and authority is hereby given said corporation to construct bridges over said Missouri river and all other rivers, for the convenience of said road: provided, that any bridge or bridges it may construct over the Missouri river, or any other navigable stream on the line of said road, shall be constructed with suitable and proper draws, etc., and shall be built, kept, and maintained at the expense of said company, in such manner as not to impair the usefulness of said rivers for navigation." The company commenced in 1869 the construction of the bridge here in question at the point where it now is, but before it was completed, congress passed an act, approved February 24, 1871, having a material bearing upon the present controversy. 16 Stat. 430. This enactment is as follows: "An act to authorize the Union Pacific Railroad Company to issue bonds and construct a bridge across the Missouri river at Omaha, Nebraska, and Council Bluffs, Iowa. Be it enacted by the senate and house of representatives of the United States of America, in congress assembled: That, for the purpose of more perfect connection of any railroads that are, or shall be, constructed to the Missouri river, at or near Council Bluffs, Iowa, and Omaha, Nebraska, the Union Pacific Railroad Company be, and is hereby, authorized to issue bonds and secure the same by mortgage on the bridge and approaches, as it may deem needful, to construct and maintain its bridge over said river, and tracks and depots required to perfect the same, as now authorized by law of congress; and said bridge may be so constructed as to provide for the passage of ordinary vehicles and travel, and said company may levy and collect tolls and charges for the use of the same; and for the use and protection of said bridge and property, the Union Pacific Railroad Company shall be empowered, governed, and limited by the provisions of the act entitled 'An act to authorize the construction of certain bridges, and to establish them as post roads,' approved July 25, 1866, so far as the same is applicable thereto: And provided, that nothing in this act shall be so constructed as to change the terminus of the Union Pacific Railroad from the place where it is now fixed under existing laws, nor to release said Union Pacific Railroad Company, or its successors, from its obligations as established by existing laws: Provided, also, that congress shall at all times have power to regulate said bridge, and the rates for the transportation of freight and passengers over the same, and the local travel hereinbefore provided for. And the amount of bonds herein authorized shall not exceed two and a half millions of dollars: Provided, that if said bridge shall be constructed as a draw-bridge, the same shall be constructed with spans not less than two hundred feet in length in the

clear, on each side of the central or pivot pier of the draw."

Under the authority thus conferred to mortgage the bridge, the company, April 1, 1871, mortgaged the same, and its tolls and income, to secure bonds to the amount of $2,500,000 in gold, which bonds are now outstanding. But before the said bridge was commenced, viz., November 1, 1865, the company, under authority given by the 10th section of the act of July 2, 1864, had mortgaged to trustees "all and singular the railroad and telegraph of said company heretofore constructed or hereafter to be constructed on a point on the western boundary of the state of Iowa, heretofore fixed by the president of the United States, to-wit, at the city of Omaha," etc., with all lands, rights of way, easements, depot buildings, and franchises for building and operating the said road, etc., etc., to secure the first mortgage bonds, of which $27,000,000 are alleged to be outstanding, and the government has a subordinate lien for many millions of dollars to secure the repayment of the bonds it issued to the company. The 12th section of the original charter of the company contained, inter alia, this provision: "The whole line of said railroad and branches and telegraph shall be operated and used for all purposes of communication, travel, and transportation, so far as the public and government are concerned, as one connected, continuous line." The 15th section of the amended charter of 1864 contained the provision: The several companies, for the purposes of communication, travel, and transportation, so far as the public and the government are concerned, shall operate and use said roads as one continuous line, and in such operation and use to afford and secure each equal advantages and facilities as to rates, time, and transportation, without any discrimination of any kind in favor of the road and business of any or either of said companies, or adverse to the road or business of either of the others. As late as the 20th day of June, 1874, by an act entitled "An act making additions to the 15th section of the act approved July 2, 1864" (the amendatory act of 1864 above referred to, 1873–74, 18 Stat. 111), the said 15th section is amended by the addition thereto of the following: "And any officer or agent of the companies authorized to construct the aforesaid roads, or of any company engaged in operating either of said roads, who shall refuse to operate and use the road or telegraph under his control, or which he is engaged in operating for all purposes of communication, travel, and transportation, so far as the public and the government are concerned, as one continuous line, or shall refuse, in such operation and use, to afford and secure to each of said roads equal advantages and facilities as to rates, time or transportation, without any discrimination of any kind in favor of, or adverse to, the road or business of any or either of said companies, shall be deemed guilty of a misdemeanor, and, upon conviction thereof,

shall be fined in any sum not exceeding $1,-000, and may be imprisoned not less than six months." Further provisions are made for suit by the party aggrieved (prescribing the courts in which suit may be brought, and the mode of service therein), "in case of failure or refusal of the Union Pacific Railroad Company, or either of said branches, to comply with the requirements of this act, and the acts to which this act is amendatory." On other questions this proceeding has already been several times before the court. [Case No. 16,599] and Hall v. Union Pac. R. Co. [Id. 5,950]. A return has been made to the alternative writ, and an answer thereto been filed, and the case is now before the court on the motion of the relators for a peremptory mandamus.

John N. Rogers, for relators.

J. M. Woolworth and A. J. Poppleton, for the railroad company.

Before DILLON, Circuit Judge, and LOVE, District Judge.

DILLON, Circuit Judge. In a controversy which has excited intense local feeling, and one involving such large interests, and to which so much attention has been drawn on the part of the public and of congress, and which has been so fully argued at the bar, the court would be justified in stating with more than usual fullness the grounds of its judgment, but as its determination is not final, and as it is understood that the unsuccessful party, whichever it may be, will carry the order here made for revision to the supreme court, it is not our purpose to discuss the case with that degree of elaboration we should otherwise do, and which its intrinsic importance would well warrant.

We now proceed to notice the material questions involved in the application for the peremptory writ. If the road which the respondent is bound to operate, has its terminus on the western shore of the Missouri river, as its counsel have contended—in other words, if, under the acts of congress applicable to the respondent, it was not authorized to build the road it is required to operate, to the Iowa shore of the river—it may be conceded that the result would be that the relators would not be entitled to the writ they seek. What point, therefore, does the charter of the company fix as the commencement of what is therein termed the "Iowa Branch?" This question is answered by the following language in the act of 1862: "The said Union Pacific Railroad Company is hereby authorized and required to construct a single line of railroad and telegraph from a point on the western boundary of the state of Iowa, to be fixed by the president of the United States." In the executive orders of November 17, 1863, and March 4, 1864, President Lincoln did not undertake to change this provision, but carefully conformed to it. Accordingly, those orders named "the western boundary of the state of Iowa" as "the point

from which the company should construct their branch road to the 100th meridian." Indisputably, then, the commencement point of the Iowa branch is on "the western boundary of the state of Iowa." This precise language as descriptive of "the point of commencement," is twice used in the section (14) which provides for the building of the branch, and prescribes its commencement, course, and termination. Indeed, counsel for the company do not deny, in argument, that the commencement point of the road, as prescribed by the terms of the charter, is upon the western boundary of Iowa, but they raise a question as to what is the western boundary of that state, and deny that this language means the eastern shore of the river. The argument of the company's counsel on the subject can best be presented in his own language. He says: "The western boundary of the state of Iowa is in the middle of the Missouri river. 9 Stat. 52. The road is to be constructed, then, from a point, to be fixed by the president, in the middle of the main channel of the river. But it is said that is impracticable, and you must put your initial point on the Iowa shore, or a part of the authorized road cannot be built. But there is this rule, that a grant of this kind is to be strictly construed. You cannot go beyond the limits fixed, and if you cannot go to the limits fixed, you must go as near them as you can, always keeping within them. If it is impracticable to begin the road in the middle of the river, you must begin on the Nebraska shore."

If it be granted that congress, by the use of the words "point on the western boundary of the state of Iowa as descriptive of the 'point of commencement' of the 'Iowa Branch,'" meant to refer to the legal boundary of the state as declared in 1846 (9 Stat. 52), the views of counsel would be sound. And if there is nothing to show that congress meant some other than the legal boundary, there would be a strong presumption that the legal boundary was the one here intended. There is, however, in various provisions of the charter of the company, evidence of a very satisfactory character that congress, in the language under consideration, referred to the boundary of the state on the river rather than on the ideal line in the middle of its channel. It had no question of territorial jurisdiction before it, and hence its attention was, probably, not drawn to the act of 1846, fixing the legal boundary. Congress, in the charters of the Union Pacific Company, as respects all of the branches, decisively meant to secure a close and immediate connection with the Iowa and Missouri railroads—leaving no hiatus or break in the line. What reason is there, then, for supposing that the central Iowa branch was intended to be exceptional in this respect? The Iowa lines of railway had not then been completed to the Missouri river, and hence could not be mentioned by name, but it is not readily to be supposed that congress, in granting the powers and furnishing the means to

construct a great national highway, intended to make no provision for crossing a broad and swift stream like the Missouri, known to be at the western end of the Iowa roads, whose completion so as to connect with the Union Pacific road was then contemplated and relied on. Therefore, when the original charter of the company authorized and required it to construct its railway from a point on the western boundary of the state of Iowa, it authorized its construction from the Iowa shore, and if a bridge was necessary to meet the requirement, then the power to build the bridge was given. Inhabitants of Springfield v. Connecticut River R. Co., 4 Cush. 63; City of Clinton v. Cedar Rapids & M. R. Co., 24 Iowa, 455, 479; People v. Rensselaer & S. R. Co., 15 Wend. 113, 130. Indeed, it might well be urged that not only was authority conferred to build the bridge, but that the duty was imposed to build it as a part of its "line of railroad" necessary to reach the prescribed point of commencement. The company did not need, so far as relates to bridges, the power given to it by the 9th section of the amended charter (1864), "to establish ferries across the Missouri river, and other rivers which its road may pass in its course," and "to construct bridges over said Missouri river, and all other rivers, for the convenience of its road," and "to enable it to make convenient and necessary connections with other roads." A bridge built under authority of the acts of 1862 or 1864, would be part of the road of the company; or, in the language of the original charter (section 14), part of its "line of railroad constructed from a point on the western boundary of the state of Iowa;" just as a bridge in a highway has often been held to be part of the highway itself. Dill. Mun. Corp. § 579. If there was doubt as to the right of the company to pass beyond the middle of the river, and go to the Iowa shore, under the original charter of 1862, that doubt is set at rest by the aforementioned 9th section of the amended charter of 1864, which, in terms, authorizes the company to construct a bridge over the Missouri river, which presupposes that the eastern end of it shall rest upon the Iowa shore; and this is done, so congress declares, "to enable the Union Pacific Railway to make convenient and necessary connections with other roads." The bridge was to be built by the Union Pacific Railroad Company. No provision was made for a bridge company, or for stock or capital for bridge purposes, and if the structure had been built under authority thus conferred, and no other, there could be no doubt that it would have been a part of the road of the company in such a sense that the company would have been bound to operate it, as much as it was bound to operate any other part of its line.

It appears, from the return to the alternative writ, that the company, under the authority thus given, and not otherwise, commenced the construction of the bridge here in question in 1869. It is proved to be a

difficult and expensive undertaking, and in 1871 the structure was far from being completed. On the 24th day of February, of that year, congress passed "An act to authorize the Union Pacific Railway Company to issue its bonds to construct a bridge across the Missouri river at Omaha, Nebraska, and Council Bluffs, Iowa." 16 Stat. 430. This enactment is supposed by the defendant to have a controlling effect on the present controversy; and it undoubtedly has an important bearing upon it. It is given in full in the statement of the case. It authorizes the Union Pacific Railroad Company "to make a mortgage on the bridge and approaches and appurtenances," and to issue bonds not to exceed $2,500,000, to be secured by such mortgage.

Notwithstanding the rule of law that authority to levy and collect tolls must be plainly conferred, and the able argument of the relators' counsel on this point, it is clear to our minds that congress gave, by this act, to the company the right to "levy and collect tolls and charges for the use of the bridge," reserving, in the second proviso, the "power at all times to regulate said bridge, and the rates for the transportation of freight and passengers over the same, and the local travel hereinafter provided for." It is manifest, from this language, that tolls and charges, other than those for local travel, were contemplated as being within the competency of the company to levy and collect for the use of the bridge. Besides, the chief value of the bridge as a security would be the tolls, and the authority to make a mortgage for $2,500,000 on the mere bridge structure and approaches, without the right to levy tolls, and pledge the same to the lender, would, doubtless, have proved a barren power, since it would be quite imposible to negotiate such a security. It is evident, from the tenor of the bridge mortgage, that all the parties to that instrument thus understood the act of 1871. The act contains, also, the important provision that it shall not "change the eastern terminus of the Union Pacific Railroad from the place where it is now fixed under the existing laws, nor release said company from its obligations under existing laws." It also contains a clause adopting, as far as applicable to the bridge in question, the provisions of the bridge act of July 25, 1866 (14 Stat. 244). The act also contains a clause authorizing the bridge to be "so constructed as to provide for the passage of ordinary vehicles," but the privilege was not used, and so need not be considered. The bridge act of 1871, it is to be observed, does not profess to repeal the previous authority, express or implied, on the part of the company to bridge the Missouri river, but only to confer additional powers and make additional provisions. All the provisions of the several acts are to be read together; and thus viewed the respondent would have, inter alia, the following rights

and powers in respect to the bridge in question: (1) To build it under the original and amended charter as part of its road, and from a point on the Iowa shore. (2) Under the act of 1871 it was so far disconnected from the road as to authorize it to be separately mortgaged as a bridge, and this act empowered the company to levy and collect tolls and charges for the use of the same as a bridge, or compensation for the use of it, by other railroads constructed to the Missouri river at or near Council Bluffs and Omaha, congress reserving the power to regulate the bridge and the rates for transportation of freight and passengers over the same. But it was expressly provided that this act should not change the then existing eastern terminus of the company's road, nor release the company from its obligations under existing laws. By this last provision it was doubtless intended to declare that the eastern terminus of the road should remain where it had before been established, and then existed, namely, on the Iowa shore, and the existing obligations of the company springing from that fact should remain in full force. One of these obligations is that while the bridge mortgage remains unforeclosed, and the bridge is in possession of the company, the company must operate it as part of its road, which it has never ceased to to be, although it may, under the act of 1871, charge special rates for its use, subject to the control of congress. Three several times, first in the act of 1862 (section 12), then in the act of 1864 (section 15), and lastly, as late as June 20, 1874, has congress required the respondent "to operate and use its road for all purposes of communication, travel, and transportation, so far as the public and government are concerned," as one continuous line. This last act even goes so far as to make it criminal on the part of the controlling officers or agents of the companies, or either of the companies, to refuse thus to operate the roads or either of them— thus demonstrating that congress intended that each road, singly, as well as all the roads constituting part of the system of Pacific roads contemplated by the acts of 1862 and 1864, should be operated without breaks or unnecessary delay, as a continuous line, without favor or discrimination towards either persons or localities.

If we are right in the position that the eastern terminus of the road of the respondent is on the Iowa shore, then, inasmuch as the bridge act of 1871, upon which the respondent so strongly relies, declares that such terminus remains unchanged, notwithstanding that act, the conclusion necessarily follows that the respondent must operate its trains over the bridge under its control as part of a continuous line of road, and operate them over its entire line of road from terminus to terminus. Such a duty has been enforced by a mandamus without such specific legislation as congress has provided in

this behalf by the act of March 3, 1873 (17 Stat. 509, § 4, last clause), which, in terms, gives "to the proper circuit court of the United States jurisdiction to hear and determine all cases of mandamus, to compel the Union Pacific Railroad Company to operate its road as required by law." State v. Hartford & N. H. R. Co., 29 Conn. 538; Rex v. Severn & W. Ry. Co., 2 Barn. & Ald. 646. Suppose the respondent should habitually stop its regular trains two miles west of Omaha and refuse to run them eastward of that point, or only run "transfer trains," is there any doubt, under the legislation of congress, that it could be compelled to operate and run its regular trains into that city? And so in the case before us, if the bridge on which its track is extended is to be considered as part of its road, within the meaning of the acts of congress requiring it to operate its whole line without any break in its continuity. In this view the transfer device of the company, putting passengers and shippers of freight to unnecessary delay, inconvenience and expense, is in violation of the duty which the company owes to the public. If made by the company with third persons, without legislative authority, it would be ultra vires. It is none the less objectionable that it is made by its own employés.

A point is made by the respondent against the writ on the ground that the bridge structure is not opposite section 10, as fixed by the president, but some two miles down the river. In point of fact, after getting bonds and lands by reason of that location, the company has abandoned the track through section 10, and instead of crossing the river opposite that section, has constructed its road so as to connect with the present bridge. If this change in the location of the bridge from section 10 was authorized as an implied effect of the act of 1871, applied to the subject matter, the objection under consideration fails. Originally, under the order of President Lincoln, the bridge should have been constructed so as to reach the Iowa shore east of and opposite section 10. Instead of this, the company commenced a bridge at the site of the present bridge, two miles south. Congress, in 1871, authorized that bridge to be completed and mortgaged, thereby legalizing the change, and doubtless relieving the company of the duty of bridging the stream opposite section 10. And, therefore, when congress also said that the act of 1871, in relation to the bridge, should not "change the eastern terminus of the road from the place where it is now fixed under the existing laws," it did not mean that the company should still be under an obligation to build a bridge opposite section 10, but that the Iowa shore should, notwithstanding the bridge act, remain the eastern terminus of the road, and the company's obligation in this regard should continue. But if the change in the location of the bridge was not authorized by the act of 1871, still

the company ought to be estopped to say we have reached our eastern terminus at the wrong place, and hence cannot be compelled to operate the whole length of our actual line of road.

Again, it is suggested by the respondent's counsel that this view, if sound, necessarily has the effect to subordinate the bridge mortgage for $2,500,000, which was intended to be a first lien upon the bridge as well as its tolls, to the prior mortgage of the company upon its entire line of road.

These respective mortgagees are not before us, and their rights cannot be touched by anything here decided. We content ourselves, therefore, with the remark that, observing the terms of the two instruments, we do not see that the result suggested necessarily follows from the positions we have attempted to maintain. It were premature at this time to anticipate that there will be a sale under the bridge mortgage, and to consider the rights of the purchaser, of the company, of the public, or of the government after that event.

Two technical points are made by the respondent. The first is that no demand is averred. Under the circumstances of this case, this objection, being made at the hearing on the merits, and the duty being a public one, which the respondent has all the time denied to exist, comes too late. The object of a demand is to give the option to do or refuse that which is demanded, and it is evident that a demand by the relators would not have obviated the necessity for this proceeding to determine the contested question of public right and duty here involved. Dill. Mun. Corp. § 696. The other point is more substantial, and, indeed, fatal, to the application in its present form for the peremptory writ, unless the objection can be avoided by amendment. The proceedings by mandamus at common law are characterized by unreasonable strictness; and an established rule of practice in the queen's bench is that the mandate of the peremptory writ cannot be moulded by the court after hearing upon the return of the alternative writ, but the peremptory writ must be denied altogether unless the sphere of its mandate is exactly coincident to the mandate of the alternative writ. Queen v. East & West India Docks & B. J. Ry. Co., 2 El. & Bl. 466; 3 Adol. & E. 534; 14 Adol. & E. (N. S.) 59.

If the propositions heretofore advanced are correct, the mandate of the alternative writ was too broad in that it commanded the defendant to operate the bridge under a uniform tariff of freights and fares with the residue of the road.

We hold that the defendant may, under the act of 1874, exact special tolls and charges for the use of its bridge. Anticipating that this might be the view of the court, the relators' counsel have, in that event, asked leave to amend by striking out of the mandate of the alternative writ the words, "and freight and passenger tariff," and that the peremptory

writ issue so as to conform to the alternative writ as thus amended. Undoubtedly this amendment ought to be allowed. In this country, and at this day, the writ of mandamus has lost its prerogative character, and the proceedings are governed by the same liberal rules which obtain in ordinary legal remedies. According to Chief Justice Taney, "the right to the writ, and the power to issue it, have ceased to depend on any prerogative powers, and it is now regarded as an ordinary process in the case to which it is applicable. It is a writ to which every one is entitled, when it is the appropriate process for asserting the right he claims." Kentucky v. Dennison, 24 How. [65 U. S.] 66. In our judgment, the true rule is to allow, on proper terms, amendments in proceedings by mandamus at all times, both as to form and substance, in the interests of justice. In England, 9 Anne, c. 20, § 7, extended the statutes of jeofails "to all writs of mandamus, and all the proceedings thereon." Speaking of the power to allow amendments, Mr. Justice Strong, delivering the judgment of the supreme court of Pennsylvania, remarks: "Formerly, when the doctrine of amendments remained as at common law, the court would not allow the writ of mandamus to be amended after return filed; but, as is said (Tapp. Mand. p. 334), the strict rule of the common law has been, of late years, altogether departed from, the principle as to amendment being that it shall be allowed in all cases, when such a course will promote justice." Com. v. Select & Common Councils of City of Pittsburgh, 34 Pa. St. 499, 515. And such is unquestionably the American practice. Dill. Mun. Corp. §§ 699, 701, and cases cited; High, Extr. Rem. 519. And the allowance of such amendments is within the spirit, if not, indeed, within the terms, of the liberal provisions as to amendments in the 32d section of the judiciary act. The power there given to allow amendment is broad, extending to "any defect," and should not, ordinarily, be confined to defects of form, and should be liberally viewed, and the power given liberally exercised to promote justice.

Guided by these considerations, why should the relators be denied the power to amend to conform to the views of the court, and compelled to commence anew. The defendant, it is to be supposed, has and feels no other interest in this controversy than to have its public duty authoritatively settled, and this can be as well done in this proceeding by allowing the amendment, as by forcing the relators to retrace all their steps, by commencing de novo.

Let an order be entered allowing the proposed amendment to the alternative writ, and thereupon directing the peremptory writ to issue, conformed to the alternative writ as amended. Ordered accordingly.

The judgment in this case was affirmed by the supreme court at the October term, 1875 (91 U. S. 343).